NEFTALÍ RODRÍGUEZ AMADEO, demandante y recurrido, *v.* NYDIA SANTIAGO TORRES, demandada y recurrente.

*Número:* RE-92-24      *Resuelto:* 29 de junio de 1993

*Martha L. Peña Valiente*, abogada de la parte recurrente; *Héctor Luis Ayala Vega*, abogado de la parte recurrida.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

Debemos decidir en el caso de autos cuáles son los criterios para desheredar a un hijo por alegadamente haber injuriado gravemente a su progenitor, lo que a su vez provocará el que cese la obligación de dar alimentos conforme al Art. 150 del Código Civil, 31 L.P.R.A. sec. 569.

*Hechos*

El Dr. Neftalí Rodríguez Amadeo y la Sra. Nydia Santiago Torres contrajeron matrimonio el 19 de mayo de 1967, en Salinas, Puerto Rico. Durante su matrimonio procrearon tres (3) hijos de nombres Nydia, Neftalí y Gerardo Rodríguez Santiago.

El 1ro de noviembre de 1983, el doctor Rodríguez Amadeo, quien es médico con especialidad en medicina interna, presentó una demanda de divorcio por la causal de trato

cruel.[1] Al momento de instarse la demanda de divorcio, los hijos del matrimonio contaban con las edades de quince (15), trece (13) y cinco (5) años, respectivamente.

El 21 de febrero de 1985 se permitió, con la anuencia del tribunal, enmendar la demanda de divorcio presentada por el doctor Rodríguez Amadeo a los fines de alegar la causal de separación. Posteriormente, el 3 de abril de 1985 se decretó disuelto el matrimonio. En la sentencia emitida por el Tribunal Superior, Sala de Guayama, se le concedió a la madre la patria potestad y custodia de los tres (3) hijos menores habidos en el matrimonio. Se fijó una pensión alimentaria de novecientos dólares ($900) mensuales. Además, se dispuso que el demandante pagara la renta mensual de la casa, donde residen los menores junto a su madre. Ésta es un bien ganancial. Asimismo, vendría obligado el doctor Rodríguez Amadeo a pagar todos los gastos relacionados con la escuela de los menores, mantendría a éstos incluidos en un plan médico y terminaría de pagar el balance que se adeudaba del automóvil Volvo, el cual quedaría en manos de la demandada. Al terminarse de pagar dicho auto, la pensión alimentaria aumentaría de novecientos dólares ($900) a mil cien dólares ($1,100) mensuales.[2]

Posteriormente, el 29 de julio de 1991, una compareció por derecho propio mediante una moción presentada dentro del proceso original de divorcio de sus padres, Neftalí Rodríguez Santiago, hijo del doctor Rodríguez Amadeo y la señora Santiago Torres. Éste, al momento de presentar esta moción para reclamar alimentos al amparo del Art. 143 del Código Civil, 31 L.P.R.A. sec. 562, contaba con veintiún años (21) de edad. Alegó en la misma que era estudiante de bachillerato a tiempo completo y sin interrup-

---

[1] La Sra. Nydia Santiago Torres contestó la demanda de divorcio e instó reconvención por la causal de trato cruel.

[2] Todo esto había sido ofrecido por el doctor Rodríguez Amadeo al presentar la demanda de divorcio, y el padre alimentante ha cumplido a cabalidad con lo dispuesto en la sentencia de divorcio.

ción en la Universidad de Puerto Rico, Recinto de Río Piedras. Que había hecho las gestiones pertinentes para cursar estudios en la Escuela de Medicina de la Universidad Central del Caribe con sede en Bayamón y que fue aceptado.([3]) Sostuvo que le requirió a su padre, el doctor Rodríguez Amadeo, el pago de la matrícula para comenzar los estudios de medicina, así como el costo de los libros que le fueron asignados,([4]) pero que éste se negó a ello en varias ocasiones. Con respecto a esta moción presentada por el hijo del doctor Rodríguez Amadeo, el tribunal de instancia señaló una vista.

Así las cosas, el doctor Rodríguez Amadeo replicó la moción presentada por su hijo mediante una moción en la que solicitó rebaja de la pensión alimentaria. Alegó que sus dos (2) hijos mayores, Nydia y Neftalí, de veintitrés (23) y veintiún (21) años, respectivamente, habían alcanzado la condición legal de emancipados. Por lo tanto, no tenían derecho a recibir alimentos como menores. Sostuvo, además, que los referidos hijos mayores habían terminado sus estudios de bachillerato y no habían probado circunstancias extraordinarias que justificasen mantener la pensión actual. Con respecto a su hijo Neftalí, alegó específicamente que no había demostrado:

(a) Continuidad, Diligencia, Perseverancia, Seriedad (esfuerzos realizados).
(b) Aptitud manifiesta por los estudios que desea proseguir.
(c) Resultados Académicos.
(d) Razonabilidad del objetivo deseado.

Asimismo, planteó que los alimentistas, sus dos (2) hijos mayores, pueden ejercer un oficio o profesión que les permita mejorar su destino y fortuna, de manera que no les

---

([3]) Efectivamente, consta en el expediente del caso que se presentó y admitió en evidencia una certificación de la Universidad Central del Caribe en la que se indica que Neftalí Rodríguez Santiago había sido admitido para comenzar estudios a partir de agosto de 1991.

([4]) Solicitó la cantidad de ocho mil quinientos dólares ($8,500).

sea necesaria la pensión alimentaria para su subsistencia. Finalmente, alegó que sus dos (2) hijos mayores cometieron faltas graves que dan lugar a la desheredación, por lo que conforme al Art. 150 del Código Civil, *supra*, cesa o se extingue la obligación de prestar alimentos.([5])

Celebrada la vista para discutir la moción presentada por el hijo Neftalí Rodríguez Santiago, el tribunal de instancia dispuso, mediante orden emitida en corte abierta, que tanto éste como su hermana mayor quedaban excluidos de la pensión alimentaria que pagaba su padre el doctor Rodríguez Amadeo. Determinó, además, que a partir de 1ro de agosto de 1991, fecha en que se celebró la vista, se le pasaría una pensión alimentaria al menor Gerardo Rodríguez Santiago de trescientos sesenta y seis dólares con sesenta y seis centavos ($366.66) mensuales.([6]) La vista en su fondo para dilucidar lo relacionado con la reclamación de alimentos instada por el hijo Neftalí se reseñaló, por acuerdo entre las partes, para permitir un corto periodo de descubrimiento de prueba.

---

([5]) A pesar de que se alegó lo de faltas graves con respecto a los dos (2) hijos mayores, todo el proceso se circunscribió a las actuaciones de Neftalí.

([6]) De la determinación del tribunal de instancia de modificar la pensión alimentaria del menor Gerardo Rodríguez sin atenerse a lo dispuesto en la Ley Especial de Sustento de Menores, Ley Núm. 5 de 30 de diciembre de 1986, según enmendada, 8 L.P.R.A. sec. 501 *et seq.*, y las Guías Mandatorias de Pensiones Alimenticias, no se interpuso recurso de *certiorari* dentro de un término razonable. Se cuestionó la corrección de esta determinación por primera vez a los cinco (5) meses después de haberse dictado la orden. Esto se hizo dentro del recurso presentado por su hermano Neftalí cuestionando una determinación posterior del tribunal a los efectos de que este último incurrió en actos injuriosos contra su padre, los cuales eran causa suficiente para su desheredación. Por tal razón, mediante resolución denegamos por incuria el recurso presentado en cuanto a lo señalado en éste con respecto al menor, Gerardo. Esto, claro está, sin menoscabo de que posteriormente el menor pudiera solicitar una modificación de la pensión alimentaria de estimarla necesaria.

Después de todo,

"[l]os decretos fijando o modificando pensiones alimenticias previamente vigentes siempre, por su propia naturaleza, son de carácter temporero, provisional o interlocutorio. Se cambiarán según cambien las circunstancias que lo justifiquen. No adquieren finalidad. No son, por tanto, susceptibles de recursos de apelación, precisamente por su naturaleza temporera, sin finalidad alguna. El recurso de alzada disponible es el de Certiorari ...." S. Torres Peralta, *La nueva ley especial de sustento de menores y el derecho a pensión alimenticia*, 49 (Núms. 3–4) Rev. C. Abo. P.R. 17, 170 (1988).

Luego de celebrada la vista, el tribunal dictó sentencia en corte abierta. Ésta fue llevada a escrito el 22 de noviembre de 1991. En dicha sentencia el tribunal de instancia determinó como un hecho probado que "[e]l joven Neftalí Rodríguez Santiago [había] maltratado e injuriado gravemente a su padre frente a sus familiares, amigos y pacientes del doctor Rodríguez Amadeo. *Dichas injurias y maltrato fueron efectuadas durante la mayoría de edad y en lugares públicos*". (Énfasis suplido.) A base de esto concluyó que el joven Neftalí Rodríguez Santiago "por su comportamiento altanero, irrespetuoso y con un craso desprecio a la dignidad de su padre cabó [sic] la tumba a su futuro" y, por ende, "no tiene ningún [sic] derecho a venir a pedir alimentos a un ser que ha profanado tanto".

De esta determinación, el joven Neftalí interpuso recurso de *certiorari* planteando la comisión de varios errores,([7]) entre éstos, el eliminar la pensión alimentaria de Neftalí Rodríguez Santiago sin antes tomar en consideración y celebrar la vista sobre todos los hechos del caso; el tomar conocimiento judicial de presuntas denuncias las cuales no se especificaron, dónde y cuándo fueron presentadas y el número específico del caso, esto contrario a lo establecido en la Regla 11 de Evidencia de 1979 (32 L.P.R.A. Ap. IV); el no tomar en consideración el Art. 781 del Código Civil, 31 L.P.R.A. sec. 2459, sobre los efectos de la reconciliación; el interpretar y apreciar que hechos ocurridos cuando Neftalí Rodríguez Santiago era menor de edad ocurrieron cuando éste ya era mayor de edad, esto contrario a la prueba presentada según se narraron dichos incidentes por todos los testigos, y el interpretar que Neftalí Rodríguez Santiago no cumple con los requisitos establecidos en el caso *Key Nieves v. Oyola Nieves*, 116 D.P.R. 261 (1985).

---

([7]) Es innecesario que discutamos el primer señalamiento de error por la razón expresada en el esc. 6.

Decidimos revisar y expedimos el auto de *certiorari* presentado.

## II

La recurrente alega, en síntesis, que el tribunal de instancia no debió eliminar la pensión alimentaria que el doctor Rodríguez Amadeo pasaba a su hijo Neftalí y que erró al interpretar que, en el presente caso, no se cumple con los requisitos de *Key Nieves v. Oyola Nieves*, supra. Le asiste la razón; veamos por qué.

■ En repetidas ocasiones hemos expresado que los casos de alimentos a hijos menores de edad están revestidos del más alto interés público. *Piñero Crespo v. Gordillo Gil*, 122 D.P.R. 246 (1988); *López v. Rodríguez*, 121 D.P.R. 23 (1988); *Negrón Rivera y Bonilla, Ex parte*, 120 D.P.R. 61 (1987). La obligación de alimentar a los hijos emana de dos (2) artículos del Código Civil: el Art. 153 (31 L.P.R.A. sec. 601), que impone dicha obligación a los padres que ostentan la patria potestad, y el Art. 143 del Código Civil, *supra*, que fija la responsabilidad de alimentos entre parientes. *Guadalupe Viera v. Morell*, 115 D.P.R. 4 (1983). Hay que distinguir entre las obligaciones alimentarias de estos artículos. En *Guadalupe Viera v. Morell*, supra, págs. 12–13, dijimos que:

En el caso del Art. 153, es decir, la obligación alimenticia que emana del ejercicio de la patria potestad, se parte del supuesto de que el alimentista menor de edad está bajo la custodia del padre que ejerce sobre él la patria potestad, o de ambos si están casados entre sí. Como señala Beltrán de Heredia, no se trata estrictamente de una obligación alimenticia independiente o autónoma, sino que está incorporada al conjunto más amplio de deberes y derechos que representa la patria potestad, entre los cuales se encuentra el deber de convivir con los hijos, alimentarlos en su mesa, educarlos, guiarlos y representarlos. Este deber de alimentación, ínsito [sic] a la patria potestad, no depende de un estado de necesidad del hijo, pues éste incluso podría tener bienes suficientes para su sostenimiento y aún

tener derecho a ser alimentado por sus padres con patria potestad, sino que se basa en el hecho mismo de la generación. (Escolios omitidos.)

■ La obligación que emana de este artículo se extingue con la emancipación del menor, ya sea la misma una emancipación menos plena o de carácter pleno. S. Torres Peralta, *La nueva ley especial de sustento de menores y el derecho a pensión alimenticia*, 49 (Núms. 3–4) Rev. C. Abo. P.R. 17, 63 (1988).

De otra parte, y en lo que respecta al Art. 143, *supra*, dijimos en *Guadalupe Viera v. Morell*, supra, pág. 13, que:

La obligación alimenticia que surge del Art. 143 se refiere al caso del padre o de la madre de hijos no emancipados que no viven en su compañía y sobre los cuales no tiene la patria potestad, y a hijas y otros parientes, no importa su edad, que tengan necesidad de alimentos, y siempre que el alimentante cuente con recursos para proveerlos. A diferencia de la obligación bajo el ejercicio de la patria potestad, el deber de proveer alimentos bajo el articulado del Código que regula los alimentos entre parientes se basa en el estado de necesidad del hijo y depende de la condición económica del padre alimentante. Se distingue, además, en que la obligación es exigible cuando se demuestra la necesidad de alimentos del hijo y son reclamados judicialmente. (Citas omitidas.)

■ La obligación alimentaria que emana del Art. 143, *supra*, requiere que el menor tenga necesidad de una pensión alimentaria. Dicha pensión no cesará automáticamente con la emancipación del menor, ni en el caso de que éste llegue a la mayoría de edad.[8] Puede extenderse después de que hijo cumpla la mayoría de edad si se dan las circunstancias expresadas en *Key Nieves v. Oyola Nieves*, supra. Hay que tener presente que el Art. 142 del Código Civil, 31 L.P.R.A. sec. 561, define *alimentos* como "todo lo que es indispensable para el sustento, habitación, vestido y

---

[8] Ya anteriormente habíamos dicho en *Sosa Rodríguez v. Rivas Sariego*, 105 D.P.R. 518, 523 (1976), que "[n]i la emancipación ni la mayoría de edad de los hijos relevan al padre de su obligación de alimentarles ...".

asistencia médica, según la posición social de la familia. Los alimentos comprenden también la educación e instrucción del alimentista, cuando es menor de edad".

■ En *Key Nieves v. Oyola Nieves*, supra, reconocimos que el tribunal deberá hacer, caso a caso, la determinación que corresponda, con respecto al pago de alimentos a los hijos mayores de edad que deseen proseguir estudios graduados o post-graduados.[9] Para guiar su determinación tomará en consideración lo siguiente:

> ... [E]l hijo que solicite "alimentos" o asistencia económica para estudios "postgraduados" deberá demostrar afirmativamente que es *acreedor de tal asistencia económica* mediante la *actitud demostrada* por los esfuerzos realizados, la *aptitud manifestada* para los estudios que desea proseguir a base de los resultados académicos obtenidos, y la *razonabilidad del objetivo* deseado. (Énfasis en el original y escolio omitido.) *Key Nieves v. Oyola Nieves*, supra, pág. 267.

■ Además, sostuvimos que tienen que darse todos los criterios antes señalados a satisfacción del tribunal para que entonces se proceda a fijar la cantidad de ayuda económica que sea razonable. Claro está, no podemos olvidar el hecho de que no siempre el padre alimentante vendrá obligado a pagar la totalidad de los gastos requeridos, puesto que el Art. 146 (31 L.P.R.A. sec. 565) dispone que "[l]a cuantía de los alimentos será proporcionada a los recursos del que los da y a las necesidades del que los recibe, y se reducirán o aumentarán en proporción a los recursos del primero y a las necesidades del segundo". Apliquemos, pues, todo lo anteriormente expuesto al caso de autos.

El joven Neftalí Rodríguez Santiago se graduó de Escuela Superior del Colegio Ponceño. Su propio padre, el doctor Rodríguez Amadeo, admitió en la vista en su fondo

---

[9] El Art. 142 del Código Civil, 31 L.P.R.A. sec. 561, incluye el derecho del alimentista a cursar estudios de bachillerato siempre que los mismos hayan sido comenzados durante la minoridad. Esto fue reafirmado en el caso *Key Nieves v. Oyola Nieves*, 116 D.P.R. 261 (1985).

que su hijo Neftalí fue estudiante de honor en la Escuela Superior. Éste continuó estudios de bachillerato en la Universidad de Puerto Rico, Recinto de Río Piedras, inmediatamente después de graduarse de la escuela superior. Si bien es cierto que de la transcripción de créditos presentada en evidencia surge que no acumuló durante el bachillerato un promedio de honor, sí obtuvo un buen promedio, B (2.88).[10] Éste lo obtuvo aun cuando tomó un número de cursos en la Facultad de Ciencias Naturales, los cuales se caracterizan por un alto grado de dificultad. Este promedio le permitió ser aceptado en una escuela de medicina acreditada, la Escuela de Medicina de la Universidad Central del Caribe. El deseo del joven Neftalí de superarse en el aspecto profesional se refleja al haber gestionado proseguir estudios graduados inmediatamente después de haber terminado su bachillerato. Culminó sus estudios de bachillerato en el verano de 1991 y para agosto de ese mismo año comenzó los estudios de medicina. Esto claramente demuestra los encomiables esfuerzos realizados por este joven para iniciar sus estudios de medicina y su interés en la profesión escogida. Además, consta en evidencia una certificación de la Escuela de Medicina, que expresa que para el 8 de octubre de 1991 el estado académico (*Academic Status*) del demandante Neftalí Rodríguez Santiago, era uno de *Good Standing*.

De modo que no podemos aceptar los planteamientos del doctor Rodríguez Amadeo a los efectos de que el promedio de su hijo en las clases más importantes para estudiar medicina no llegaba a 2.40, sugiriendo con ello que no iba a ser aceptado en ninguna Escuela de Medicina o que no tenía la aptitud que se requiere para ser médico. Examinada la transcripción de créditos presentada y admitida en evidencia, se puede constatar que el promedio del joven Neftalí en los cursos de ciencia fue superior al admitido por

---

[10] Ese es el promedio, según pudimos calcular, que surge de la transcripción de créditos correspondiente a los cursos de bachillerato que consta en el expediente.

el propio joven. Independientemente del hecho de que éste tuvo que repetir algunos cursos de especialidad, el simple hecho de hacerlo y aprobarlos demuestra su perseverancia y deseo de superación. No se amilanó ante la adversidad.

■ Por otra parte, nos llama la atención que el representante legal del doctor Rodríguez Amadeo destacara que el joven Neftalí no tomara en consideración el factor económico cuando ingresó a la Escuela de Medicina, y en particular a la Universidad Central del Caribe, y que su padre tenía un nuevo hogar con dos (2) hijos. En el caso de autos, en ningún momento se ha alegado por el doctor Rodríguez Amadeo que no cuenta con medios económicos suficientes para pagar la pensión alimentaria solicitada por su hijo Neftalí y mucho menos ha desfilado prueba de ello. Nos parece apropiado destacar en este punto lo expresado en *Key Nieves v. Oyola Nieves*, supra, págs. 266–267, a los efectos de que tendrán prioridad, a base de los recursos disponibles, aquellos hijos menores de edad que cursen estudios primarios o a nivel de bachillerato. Sin embargo, en el presente caso no se ha probado carencia de recursos disponibles para pagarle los estudios al hijo del primer matrimonio y que con ello se afecte a los hijos menores del doctor Rodríguez Amadeo de su segundo matrimonio. Es importante que recalquemos que

> ... en el mundo en que vivimos hoy día, donde el éxito que se pueda obtener ... con la preparación académica que poseamos y donde la competencia es la orden del día, la percepción de que los estudios universitarios constituyen un "lujo" es cosa del pasado; dichos estudios se han convertido en una necesidad. *Key Nieves v. Oyola Nieves*, supra, pág. 266.

A esto debemos añadir que en la actualidad las oportunidades de conseguir un empleo con solamente una preparación académica de bachillerato son reducidas, ya que la competencia es mayor cada día.

Con respecto a lo alegado por el doctor Rodríguez Amadeo a los efectos de que el hijo tiene la aptitud para traba-

jar y, por ende, no debe entonces alimentarle, tampoco le asiste la razón.

No hay lugar a dudas de que ningún alimentante tiene la obligación de alimentar a un alimentista que está bien preparado para ejercer determinada profesión u oficio, pero no lo hace. El fundamento detrás de esto es, según Manresa, que no puede fomentarse la holgazanería. J.M. Manresa y Navarro, *Comentarios al Código Civil Español*, Madrid, Ed. Reus, 1956, T. 1, pág. 848. Esta no es la situación del caso de autos.

Procederemos ahora a analizar si fue correcta la determinación del tribunal de instancia a los efectos de que el joven Neftalí incurrió en conducta injuriosa contra su padre, de tal naturaleza que ésta da lugar a una causal de desheredación, lo que elimina a su vez el deber del padre de alimentarle.

### III

El Art. 778 del Código Civil, 31 L.P.R.A. sec. 2456, en lo pertinente, dispone que será causa para desheredar a los hijos y descendientes el "[h]aberle maltratado de obra o injuriado gravemente de palabra". Por otra parte, el Art. 150 del Código Civil, *supra*, dispone que cesará la obligación de dar alimentos, entre otras cosas, "[c]uando el alimentista, sea o no heredero forzoso, hubiese cometido alguna falta de las que dan lugar a la desheredación". Teniendo presente lo preceptuado por los Arts. 778 y 150 del Código Civil, *supra*, debemos primeramente determinar qué se considera una injuria grave para los efectos de este articulado.

Los tratadistas están acorde en que para determinar qué es una injuria grave el tribunal debe aplicar un criterio restrictivo "para evitar que cualquier expresión lanzada en un momento de discusión o de apasionamiento pueda después servir de base para un resultado de

desheredación". F. Púig Peña, *Tratado de Derecho Civil Español*, Madrid, Ed. Rev. Der. Privado, 1963, Vol. II, pág. 432. La dificultad para el juzgador estriba en determinar cuándo es grave la injuria o no. Para ello es necesario que haya mediado la intención o el *animus injuriandi* de esa causa; no basta la imprudencia temeraria. M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Edersa, 1980, T. XI, pág. 571. Sobre la imprudencia temeraria debemos señalar que

> ... excluye en gran parte la intención: o se constituye por un exceso de descuido o por una gran ignorancia de lo que se hace y debe hacerse. En ambos casos, falta la malicia, el propósito de hacer daño, quedando sólo un grado de intención indirecta, remota, que únicamente aprecia y determina la filosofía pura. Q.M. Scaevola, *Código Civil*, Madrid, Ed. Reus, 1944, T. XIV, pág. 1029.

■ Además, el juzgador deberá considerar los siguientes factores a la hora de decidir si se incurrió en una conducta injuriosa de tipo grave que amerite la desheredación: el tono de la familia, la conducta filial en general y el contexto social al momento en el que se produce la ofensa. Albaladejo, *op. cit.* Esto último es bien importante porque si bien es cierto que por medio de la desheredación se persigue sancionar el incumplimiento de los deberes familiares y vindicar a las figuras de autoridad, como son los padres, por otra parte, hay que tener cuidado de no aplicar a determinado núcleo familiar unos criterios rígidos que ellos mismos nunca han fomentado. Sobre este punto nos comenta A.E. Pérez Duarte y Noroña en *La obligación alimentaria: deber jurídico, deber moral*, México, Universidad Nacional Autónoma, 1989, pág. 144:

> Habíamos expresado que la obligación alimentaria surge, desde el punto de vista moral, del concepto de solidaridad misma que nos constriñe a socorrer al necesitado esperando de éste únicamente un mínimo de respeto, agradecimiento y consideración. Por ello el legislador sanciona al acreedor que

injuria, falta u ocasiona daños graves a su deudor privándolo del derecho de recibir alimentos.

En general parece una disposición justa, sin embargo, cuestionamos su validez tratándose de padres-deudores frente a hijos menores de edad-acreedores. Lo cuestionamos porque los menores carecen de juicio para evaluar objetivamente la bondad o maldad de sus actos y`quienes deben inculcarles este juicio así como el concepto de respeto y agradecimiento son los propios padres, por tanto, si el menor incurre en alguna de las conductas señaladas por la fracción tercera en este artículo es responsabilidad directa del progenitor, salvo prueba en contrario. Y, si nuestros apuntamientos son válidos, el padre no debe ser liberado de una obligación por causa de una conducta que propició su propia falta de responsabilidad y atención en la educación del menor. Recordemos que la responsabilidad sobre la educación del menor recae, en primer término en los progenitores que el menor tiene derecho a vivir en un ambiente familiar que le permita alcanzar la madurez protegido de factores que pudieran incidir negativamente en ese proceso y ello es un deber inherente a la patria potestad, su incumplimiento no puede avalar y fundamentar la terminación de la obligación alimentaria a cargo de esos progenitores que no han sabido cumplir adecuadamente con su tarea educativa.

Lo anterior plantea otra interrogante: si se debe permitir la desheredación de un hijo menor. El Art. 778, *supra*, no establece distinción alguna en cuanto al momento en que el hijo maltrató o injurió a su padre. Es decir, el artículo no establece si las actuaciones que dan lugar a la desheredación por haber injuriado gravemente al progenitor tienen que ocurrir cuando el hijo es mayor o menor de edad.

Sin embargo, varios tratadistas sostienen que no debe avalarse la desheredación de los hijos menores de edad, puesto que si no les reconocemos capacidad jurídica para ejercitar por sí mismos sus derechos y obligaciones, tampoco se les debería castigar al extremo de dejarlos sin recursos para subsistir. Pérez Duarte y Noroña, *op. cit.*, pág. 145. No podemos olvidar que "la minoría de edad habla precisamente de una falta de madurez para actuar en la comunidad, de una falta de criterio para dar una respuesta

personal, auténtica, libre a las circunstancias que se les presentan". Íd.

■ Ahora bien, ¿a qué edad se debe permitir desheredar a un menor? Sobre este particular nos comenta L. Muñoz en *Comentarios a los Códigos Civiles de España e Hispanoamérica*, México, Ed. Jurídicas Herrero, 1953, que la solución de este problema debe dejarse al arbitrio de los tribunales. Sin embargo, otros estiman que deben aplicarse por analogía las disposiciones de los códigos penales, que sostienen que los menores de quince (15) años[11] no tienen capacidad para discernir sobre la causa de la desheredación, en tanto que los mayores de dicha edad sí la tienen. Somos del criterio que en los procedimientos en los que se pretenda desheredar a un menor de edad, éstos se resolverán caso a caso y no exclusivamente a base de la edad, sino que también se considerará la intención de injuriar gravemente, el tono de la familia, la conducta filial en general y el contexto social en que se produce la ofensa. En este sentido se han expresado algunos tratadistas.

> ... "[E]l tribunal apreciará con criterio razonable si las circunstancias subjetivas del infractor (grado de discernimiento, grado de intencionalidad, atenuantes y excusas de la situación correcta) y las objetivas de hecho, configuran una causa justa e imputable al legitimario". J.L. Lacruz Berdejo y F.A. Sancho Rebullida, *Derecho de Sucesiones*, Barcelona, Ed. Bosch, 1973, T. II, pág. 193.

Teniendo en mente todo lo anteriormente expresado, veámoslo en el contexto del caso de autos.

---

[11] Aunque en Puerto Rico la mayoridad es dieciocho (18) años en la esfera penal, para cierto tipo de conducta el Procurador de Menores puede renunciar a la jurisdicción de los menores de catorce (14) años con relación a ciertos delitos, y estos menores serán juzgados como adultos. Véase la Ley de Menores de Puerto Rico, 34 L.P.R.A. sec. 2215. Por otra parte, en la esfera civil, los varones menores de dieciocho (18) años y las mujeres menores de dieciséis (16) años —con ciertas excepciones— son incapaces para contraer matrimonio. Tampoco pueden emanciparse los menores de dieciocho (18) años. Véase 31 L.P.R.A. secs. 232, 901 y 911 *et seq.* También hay que tomar en consideración que las leyes laborales imponen limitaciones con respecto al trabajo que pueden desempeñar los menores de edad.

Ciertamente la determinación del tribunal de instancia a los efectos de que toda la conducta injuriosa de Neftalí Rodríguez Santiago ocurrió cuando éste era mayor de edad, es errónea. La exposición narrativa de la prueba revela que del testimonio del propio doctor Rodríguez Amadeo surge que todos los incidentes que se suscitaron con su hijo, excepto uno, fueron cuando éste era menor de edad.[12] El primero ocurrió en 1985; para ese entonces Neftalí contaba con quince (15) años de edad. Todo aconteció en la Plaza del pueblo de Salinas cuando Neftalí vio a su padre el doctor Rodríguez Amadeo. Al acercarse para saludarlo se percató que éste estaba acompañado por la que en la actualidad es su esposa. Esto lo molestó sobremanera y su reacción inmediata fue arrojarle a la acompañante de su padre un vaso de coca-cola en el rostro.

Otro de los incidentes ocurrió un año más tarde, en 1986. Neftalí tenía en esa fecha dieciséis (16) años. Como parte de una tarea que le fue asignada en la escuela, Neftalí acudió al tribunal para hacer uso de la Biblioteca. Una vez allí, se encontró por casualidad a su señor padre. En ese momento se enteró que ese mismo día éste se casaba, por lo que lo siguió hasta el lugar donde se llevaría a cabo la recepción. Llegado al lugar, profirió una palabra obscena, la cual hacía referencia a la nueva esposa de su padre. El doctor Rodríguez Amadeo le ripostó con un puñetazo en la boca. El muchacho completamente alterado rompió entonces los cristales del carro de su progenitor.

A raíz de este incidente, Neftalí denunció a su padre, pero éste admitió que esta denuncia quedó en nada.

También se hizo referencia a un incidente ocurrido con

---

[12] Aplica entonces aquí la norma de *Rivera Pérez v. Cruz Corchado*, 119 D.P.R. 8, 14 (1987), a los efectos de que "[e]s norma reiterada en nuestra jurisdicción que este Tribunal no intervendrá con la apreciación que de la prueba desfilada haya hecho el tribunal de instancia en ausencia de pasión, prejuicio, parcialidad o error manifiesto. Debe recordarse, sin embargo, que 'el arbitrio del juzgador de hechos es respetable, más no es absoluto' y que una 'apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de este Tribunal' ". (Citas omitidas.)

motivo de haber ordenado el doctor Rodríguez Amadeo que descontinuaran el servicio de agua en la casa donde habitaban sus hijos. Sobre éste no se hace mención de fecha alguna. La representación legal de Neftalí alega sin embargo, que este incidente ocurrió cuando el joven era menor de edad.

El último incidente ocurrió en julio de 1991, cuando ya Neftalí contaba con veintiún (21) años y acudió al consultorio de su padre para requerirle que le pagara los estudios de medicina. Al éste negarse, lo llamó "cerdo."

Al analizar el impacto de estos hechos con relación al articulado sobre la desheredación, hay que tomar en consideración las circunstancias que motivaron los actos del joven Neftalí hacia su padre. Una lectura desapasionada de la exposición narrativa de la prueba demuestra con meridiana claridad el sentimiento de abandono experimentado por Neftalí Rodríguez Santiago a raíz del divorcio de sus padres.[13] Al dar inicio el proceso de divorcio de sus progenitores, Neftalí contaba solamente con trece (13) años de edad, un preadolescente en la etapa crítica de transición entre la niñez y la adolescencia. Este joven aparenta haber sido una víctima inocente del fracaso matrimonial de sus padres, el cual fue un tanto tortuoso. Se le hizo muy difícil comprender que su padre volviera a rehacer su vida con un nuevo matrimonio y se olvidara de sus obligaciones para con los hijos procreados en su primer matrimonio. El propio padre admitió que luego de la ruptura matrimonial estuvo varios años sin ver a sus hijos. Esto obviamente afectó profundamente la relación de éstos con su padre. En varias ocasiones, mientras el joven Neftalí ofrecía su testimonio expresó que añoraba que su papá fuese como era antes. Manifestó que "[c]uando él era pequeño el papá no era así".

Cabe señalar que nadie se preocupó por buscarle ayuda de tipo sicológico a este menor, de manera que pudiera

---

[13] El propio padre aceptó que el cambio de actitud evidenciado por el hijo Neftalí ocurrió uno o dos años después del divorcio. E.N.P., pág. 11.

afrontar el difícil proceso del divorcio de sus padres y superar el sentimiento de pérdida y abandono que le tiene que haber causado el alejamiento de su padre.

Bien sabido es que los procedimientos de divorcio y de descalabro de la unidad familiar, invariablemente afectan a los niños de tierna edad, y a los menores de todas las edades, en mucha mayor medida que a los adultos. La diferencia usualmente estriba en que los adultos generalmente desahogan sus sentimientos y se vuelcan en imputaciones y actos de violencia psicológica y a veces física, dando rienda suelta a sus emociones. Los niños por el contrario, suelen sufrir callados, y es con frecuencia que desarrollan actitudes que los llevan a tratar de complacer a ambos. Por eso, muchas veces con un alto grado de injusticia, se les identifica como manipuladores. Es de rutina la profunda angustia que sufren generalmente en silencio y atemorizados, y muchas veces indefensos.

La mejor forma de enfrentarse al problema de debilidad emocional, angustia y sufrimiento de los hijos, y sus consecuencias, es proveyéndoles en forma tan intensa como necesaria y posible todos los servicios periciales para tratar de mantenerles su estabilidad emocional en tales circunstancias. Los servicios sociales, psicológicos, siquiátricos, y otros periciales son de especial importancia en este tipo de caso. Torres Peralta, *supra*, pág. 104.

Resulta importante hacer hincapié en que el divorcio de los padres no puede entrañar el que éstos se divorcien también de sus hijos. Sus deberes como padres continúan y, si algo, se acentúan. Deben cobrar conciencia de que con sus decisiones personales pueden afectar emocionalmente de forma adversa a sus hijos. Tienen que ayudarlos a superar la angustia y el desajuste que causa la ruptura del núcleo familiar.

De la prueba vertida en la vista en su fondo surge con meridiana claridad que el joven Neftalí Rodríguez Santiago no tuvo la intención o *animus injuriandi* de injuriar a su padre, el doctor Rodríguez Amadeo. Sus reacciones más bien respondieron a la rebeldía típica de los adolescentes, acrecentada por la situación de inestabilidad y privación del cariño y protección que produjo el divorcio de sus padres.

En cuanto al único incidente acaecido cuando el joven Neftalí era mayor de edad, éste fue el resultado de una reacción espontánea a la negativa del padre de ayudarlo con el pago de matrícula de la Escuela de Medicina. Su respuesta claramente no fue una deliberada.[14] El foro de instancia se equivocó al determinar que las actuaciones del joven Neftalí fueron de tal naturaleza que procedía su desheredación y, en consecuencia, que había cesado la obligación de su padre, el doctor Rodríguez Amadeo, de alimentarlo.

Por todo lo antes expuesto, *procede que se dicte sentencia revocando la emitida por el Tribunal Superior, Sala de Guayama, el 22 de noviembre de 1991 y devolviendo el caso al foro de instancia para que continúen los procedimientos de forma compatible con lo aquí resuelto.*[15]

El Juez Asociado Señor Alonso Alonso no intervino. El Juez Asociado Señor Fuster Berlingeri disintió sin opinión escrita.

---

[14] Quisiéramos hacer constar que este Tribunal no se solidariza con las faltas de respeto de los hijos hacia sus padres. Todo lo contrario, somos del criterio que a los padres se les debe el mayor respeto y consideración. Hoy día, más que nunca, debemos promover el respeto a las figuras que representan la autoridad, puesto que, lamentablemente, como parte de la crisis que vivimos, los menores la desafían continuamente. Sin embargo, en nuestro afán de impartir justicia, tenemos que reconocer cuándo los mayores provocan las acciones de los menores, y consciente o inconscientemente son agentes mediadores de la conducta evidenciada por los menores.

[15] Debido a la conclusión a la que hemos llegado, se hace innecesario que discutamos si hubo o no reconciliación entre el doctor Rodríguez Amadeo y su hijo Neftalí. La reconciliación entre el ofensor y el ofendido deja sin efecto la desheredación. Art. 781 (31 L.P.R.A. sec. 2459).