ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| MABEL POLA MONTERO<br><br>Parte Apelada<br><br>v.<br><br>JUAN CARLOS PRIETO IRIZARRY<br><br>Parte Apelante<br><br>JUAN FRANCISCO PRIETO POLA<br><br>Parte Interventora | KLAN202401078 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Civil Núm.: K DI2009-1118<br><br>Sala: 703<br><br>Sobre: Divorcio (Incidente: Alimentos entre parientes, joven adulto) |

Panel integrado por su presidente, el Juez Rivera Torres,[1] el Juez Salgado Schwarz y el Juez Monge Gómez.

Salgado Schwarz, Carlos G., Juez Ponente

# SENTENCIA

En San Juan, Puerto Rico, a 7 de octubre de 2025.

Comparece Juan Carlos Prieto Irizarry (señor Prieto Irizarry o el apelante), y solicita la revocación de la *Resolución Enmendada* emitida el 16 de agosto de 2024, por el Tribunal de Primera Instancia, Sala de San Juan (TPI o foro primario), notificada el 19 de agosto de 2024. Mediante el referido dictamen, el foro primario determinó la pensión entre parientes que debía recibir el hijo del apelante, el joven adulto Juan Francisco Prieto Pola (señor Prieto Pola, el apelado o el joven adulto), mientras cursaba sus estudios universitarios a nivel subgraduado y además, declaró con lugar la petición de modificación de pensión entre parientes

---

[1] Mediante Orden Administrativa OATA2025-068 del 7 de mayo de 2025, se designa al Hon. Waldemar Rivera Torres en sustitución del Hon. Félix R. Figueroa Pagán para entender y votar.

Número Identificador:

SEN2025_____

presentada por el joven adulto en julio de 2017, como interventor en el caso Civil Número K DI2009-1118, sobre divorcio y alimentos, cuando este decidió regresar a estudiar a Estados Unidos para culminar sus estudios de bachillerato a partir de agosto de 2017 e impuso al apelante una suma por concepto de honorarios de abogado.

Por los fundamentos que expondremos a continuación, **revocamos** aquellos extremos de la *Resolución Enmendada* apelada en los que el foro primario declaró ha lugar la petición de modificación de alimentos entre parientes presentada por el apelado en julio de 2017, e impuso al señor Prieto Irizarry la obligación de pagar alimentos entre parientes a favor del apelado **a partir de agosto de 2017**, así como la imposición de honorarios de abogado al apelante. Así modificada, se confirman los demás extremos de la *Resolución Enmendada.*

-I-

En el contexto de un pleito sobre divorcio, la Sra. Mabel Pola Montero (señora Pola Montero) presentó una demanda contra el señor Prieto Irizarry para, entre otros asuntos, dilucidar la pensión alimentaria entre parientes que debía recibir el señor Prieto Pola, hijo común de las partes, mientras este era menor de edad. El tracto procesal pertinente al recurso de epígrafe se circunscribe a determinar la vigencia y continuidad de la obligación de pago de la pensión alimentaria del apelado por parte de su padre, el señor Prieto Irizarry.

Al respecto, del trasfondo fáctico y procesal surge que el 28 de marzo de 2016, el apelante, presentó una solicitud de custodia del apelado (en aquel momento menor de edad), a los fines de que el foro primario lo

relevara de su obligación alimentaria por encontrarse el apelado residiendo con su progenitor desde enero de 2016, mientras continuaba sus estudios universitarios de bachillerato en la Universidad Católica.[2] En respuesta, el 27 de mayo de 2016, la señora Pola Montero, presentó *Moción para Fijar Posición* en la que destacó que aunque el apelado había pernoctado en la residencia el padre durante esa época sus necesidades se mantenían inalteradas y que era ella quien las cubría sin que el apelante hubiese aportado suma adicional.[3] Así las cosas, el 7 de junio de 2016, el señor Prieto Irizarry presentó *Oposición a Moción para Fijar Pensión*, en la que enfatizó que pagaba la pensión alimentaria de su hijo- menor de edad a esa fecha y en la que solicitó el relevo de dicha pensión alimentaria, fundamentada en que desde enero de ese año el apelado vivía con el mientras estudiaba su bachillerato en la Pontificia y argumentó que tenía su custodia de facto.[4]

En el interín, el **28 de julio de 2016, el joven adulto Juan Francisco Prieto Pola advino a la mayoría de edad** y el **19 octubre de 2016,** este presentó *Solicitud Urgente de Intervención y Alimentos y Determinación de Pensión Provisional*.[5] Allí, el apelado solicitó al foro primario que mantuviera la pensión alimentaria vigente como pensión provisional a su favor en lo que el tribunal determinaba cual era la pensión a la que el joven adulto tenía derecho: que le ordenara al apelante que la continuara pagando directamente al apelado: que le permitiera continuar como interventor en el caso y que

---

[2] *Véase* Apéndice 2 de la *Apelación*
[3] *Véase* Apéndice 3 de la *Apelación*.
[4] *Véase* Apéndice 4 de la *Apelación*.
[5] *Véase* Apéndice 5 de la *Apelación*.

además, ordenara al apelante a pagar la cantidad adeudada por concepto de pensión alimentaria. En síntesis, el apelado, como interventor, reclamó al apelante ante el foro primario alimentos entre parientes, a tenor con los artículos 153 y 143 del Código Civil de 1930, **vigente a ese momento** y solicitó además, que se mantuviese la pensión vigente hasta que el TPI determinara la cuantía de la pensión a la cual tenía derecho.

Sobre estos extremos, mediante *Orden* de **1 de noviembre de 2016**, el TPI dispuso que el Tribunal no había relevado al señor Prieto Irizarry de **la pensión alimentaria y que <u>se mantendría la misma hasta que se atendiera la solicitud de alimentos entre parientes</u>**.[6]

En desacuerdo, el 14 de noviembre de 2016, el señor Prieto Irizarry solicitó reconsideración de la *Orden* de 1 de noviembre de ese año y reiteró que desde enero de 2016 tenía la custodia física de su hijo, en aquel entonces menor de edad.[7] Acto seguido, el 1 de diciembre de 2016, el apelado presentó ante el foro primario, *Moción Urgente Para Solicitar Orden Bajo Apercibimiento de Desacato* en la que adujo que la pensión mensual vigente era de $3,000.00 y que el señor Prieto Irizarry no la había pagado por los anteriores nueve meses por lo que le adeudaba $27,000.00.[8]

Así las cosas, mediante Orden de 13 de diciembre de 2016, el foro primario señaló vista a celebrarse el 31 de enero de 2017 a los fines de valuar el relevo de

---

[6] *Véase* Apéndice 9 de la *Apelación*.
[7] *Véase* Apéndice 10 de la *Apelación.*
[8] *Véase* Apéndice 11 de la *Apelación*.

la pensión alimentaria.[9] Sobre esos extremos, el 23 de diciembre de 2016, el apelante presentó ante el TPI *Moción Reiterando Relevo de Pensión Alimentaria* en la que afirmó que desde enero de 2016, su hijo vivía bajo su custodia y que además, este incumplía con los criterios para ser acreedor a una pensión alimentaria entre parientes ya que al momento de advenir a la mayoría de edad no era estudiante a tiempo completo, por lo que reiteraba su solicitud de relevo de pensión alimentaria.[10] Asimismo enfatizó el apelante que desde el 31 de agosto de 2016 se encontraba desempleado.

La vista señalada por el foro primario se celebró finalmente el **21 de marzo de 2017** y TPI emitió ***Minuta-Resolución***. En dicha vista, el tribunal hizo constar que para el año 2016 la custodia estaba establecida, y que lo que había que determinar era si el apelado estuvo viviendo con el padre mientras estudiaba en la Universidad Católica; si ello incidía sobre los gastos del menor, para lo cual, el señor Prieto Irizarry solicitaría un crédito de la pensión que se supone que pagara.[11]

El 24 de abril de 2017, el apelado presentó ***Moción Urgente en Relación a Procedencia de Solicitud de Alimentos entre Parientes Presentada por el Interventor.[12]*** En esencia, el apelado argumentó que el foro primario no debía aplicar rigurosamente los requisitos de progreso académico a su caso particular ya que enfrentó retos en su adaptación emocional al proceso

---

[9] *Véase* Apéndice 13 de la *Apelación*.
[10] *Véase* Apéndice 14 de la *Apelación*.
[11] La Minuta de la Vista se convirtió en *Minuta -Resolución* y fue notificada el 24 de abril de 2017. Véase páginas 42-45 del Apéndice de la Apelación. (Apéndice 15).
[12] *Véase* Apéndice 18 de la *Apelación*.

educativo universitario que fueron objeto de recomendaciones de varios profesionales de la conducta que lo atendieron. Razonó además, el apelado que su necesidad surge no solo por el hecho de estar estudiando sino por tener una necesidad de salud particular. De igual forma el joven adulto añadió que la mayoridad no conlleva el cese automático de la pensión alimentaria y que la doctrina vigente referente a la aplicación del criterio de progreso académico para que prospere la petición de alimentos entre parientes se ha dado en el contexto de jóvenes que ya han culminado su bachillerato y la solicitud de pensión se presenta en el proceso de estudios en programas de maestría o estudios post graduados. **Así, este reiteró que como se encontraba aún cursando su bachillerato y tuvo una situación emocional particular surgida dentro de su minoridad, ello no le permitió avanzar académicamente como otros jóvenes de su edad.**[13]

En lo pertinente, a los alimentos entre parientes mientras el apelado cursaba su cuarto año de bachillerato en la Pontificia Universidad Católica, el **<u>4 de mayo de 2017</u> el señor Prieto Irizarry y el apelado llegaron a un <u>acuerdo</u>.**[14] **Dicho acuerdo entre las partes fue recogido por el foro primario en la _Resolución_ de 4 de mayo de 2017** e incluyó entre varias disposiciones lo siguiente:

> -Que Juan estudiaba bachillerato en la Universidad Católica; El demandado pagaría la totalidad de los estudios de Juan, pagaría el costo de los estudios de bachillerato y $300 mensuales por concepto de pensión entre parientes, que el padre pagaría el costo de los estudios de bachillerato no cubierto por becas y ayudas económicas;

---

[13] _Id_.
[14] _Véase_ páginas 65-69 del _Apéndice_ de la _Apelación_.

-Que cualquier cambio, relacionado a los estudios de Juan, las partes podrían llegar a acuerdos y en ausencia de esto acudirían al tribunal;

- Que el demandado pagaría la totalidad del costo de los libros;

-Que Juan proveería la lista de los libros al padre para que este auscultara si puede adquirir los mismos de forma más económica, en un término de 10 días desde que se entregara la lista de libros;

-Que Juan proveería las calificaciones obtenidas todos los semestres y la matrícula;

-Que el demandado no se auto relevaría de pagar la pensión establecida;

-Que el demandado pagaría el plan médico incluido en la matrícula de la Universidad Católica, que el padre podría escoger otro plan médico siempre y cuando tenga incluido en la lista de proveedores los médicos que atienden al joven, así como los medicamentos que toma;

-Que en 10 días Juan proveería al demandado la certificación del plan médico con la cubierta vigente, los medicamentos que tomaba y los médicos que visitaba

-Que Juan sometería los documentos al demandado poder solicitar alguna beca.

El 6 de julio de 2017 se celebró vista ante el foro primario y allí el TPI hizo constar que las partes habían llegado a acuerdos en torno a los $12,000 y los $21,000 que correspondía únicamente a la pensión alimentaria dejada de pagar por doce meses.[15]

**Sin embargo, a pesar del acuerdo de 4 de mayo de 2017, el <u>13 de julio de 2017</u>, el apelado presentó solicitud de modificación de alimentos entre parientes en la que informó además, que había decidido continuar sus estudios de bachillerato en otra institución universitaria y que la información sobre dicha institución universitaria se encontraba en los anejos sometidos conjuntamente con la solicitud de revisión de pensión alimentaria.[16]**

---

[15] *Véase* Apéndice 25 de la *Apelación*.
[16] *Véase* Apéndice 26 de la *Apelación*.

En desacuerdo, el señor Prieto Irizarry presentó *Moción en Oposición* a '*Moción Para Solicitar Revisión de Pensión Alimentaria' y Solicitud de Relevo de Pensión Alimentaria.*[17] En esencia el apelante argumentó que aun cuando su hijo por falta de aprovechamiento académico no cumplía con los criterios para ser acreedor a alimentos entre parientes como adulto mayor y estudiante universitario, había llegado a un acuerdo con este el 4 de mayo de 2017 en el que se obligó a pagar $300.00 mensuales y los costos de matrícula no cubiertos por becas ni ayudas económicas, el apelado de mala fe obstaculizó la obtención de becas y ayudas económicas y tomó la determinación de cambiar la institución universitaria donde cursaba sus estudios al momento del acuerdo entre las partes.

Posteriormente, el 11 de octubre de 2017 las partes presentaron *Informe Conjunto en Cumplimiento de Orden* en la que incluyeron varias estipulaciones de hechos.[18]

Tras varias vistas e incidentes procesales, el **24 de febrero de 2023**, el foro primario celebró una vista y posteriormente, mediante *Resolución* de **6 de marzo de 2023**, estableció que **las controversias pendientes en el caso se reducían a determinar si el señor Prieto Irizarry tenía un crédito durante el periodo de abril a diciembre de 2016 y si el joven adulto Juan Francisco Prieto Pola, tenía derecho a alimentos entre parientes entre abril y julio de 2017 y desde agosto de 2017 en adelante, luego de que el joven pidiera la revisión de la pensión entre parientes. De igual forma el TPI dispuso en dicha**

---

[17] *Véase* páginas 116-118 del Apéndice de la *Apelación*.
[18] *Véase* Apéndice 28 de la *Apelación*.

**Resolución de 6 de marzo de 2023, que procedía determinar si el joven adulto cumplió con la determinación de 4 de mayo de 2017 sobre los que reclama el pago y los gastos que debía reclamar de lo acordado el 4 de mayo de 2017.[19] Sobre estos extremos el foro primario dispuso expresamente en la Resolución de 6 de marzo de 2023 que en cuanto la petición de revisión de pensión entre parientes presentada por el apelado en julio de 2017, procedía 'evaluar si procedía la pensión en ese momento ante las circunstancias cambiantes de los estudios'.[20]**

Así las cosas, las vistas evidenciarias fueron celebradas por el TPI el 29 y 30 de agosto de 2023, el 23 y 24 de octubre de 2023 y el 6 y 8 de mayo de 2024.

El **30 de agosto de 2023,** durante la vista en sus méritos las partes establecieron las siguientes **estipulaciones** y los siguientes **hechos incontrovertidos:**

### ESTIPULACIONES

1. El gasto de matrícula de Juan de enero a marzo de 2017 mientras estudiaba en la Universidad Católica de Ponce ascendió a $3210. Esta suma dividida en 7 meses, esto es, de enero a julio de 2017 asciende a un gasto mensual de $458.57 mensuales.[21]

2. Los gastos médicos de Juan ascendieron a $3045,15 desde abril de 2017 a diciembre de 2019. Esta suma dividida en 33 meses (desde abril de 2017 a diciembre de 2019) equivale a un gasto mensual de $92.27.

---

[19] *Véase* Apéndice 58 de la *Apelación*, páginas 239-255. En la Resolución de 6 de marzo de 2023, el foro primario dispuso lo siguiente:
-ya el Tribunal resolvió el relevo de la pensión de menor en la Resolución de 27 de marzo de 2023. **Falta resolver el crédito del padre, si alguno durante el periodo de abril a diciembre de 2016.**
-**la determinación de pensión entre parientes consiste en dos etapas:**
-**el periodo entre abril a julio de 2017.**
- **el periodo desde agosto de 2017 en adelante, luego de que el joven pidiera la revisión de la pensión entre parientes.**
-procede además que determinemos si el joven cumplió con los acuerdos de la determinación de 4 de mayo de 2017, sobre los que reclama pago.
-los gastos que debe reclamar de lo acordado el 4 de mayo de 2017.
[20] *Id.*
[21] Se hizo el computo a base de 7 meses toda vez que en agosto el joven comenzó a estudiar en Temple y el costo de matrícula cambiaba en ese momento.

3. Los gastos médicos de $3,045.15 por el periodo de abril de 2017 a diciembre de 2019 incluye los siguientes gastos:

-$1,430 por pagos al Dr. Rafael Gomila, psicólogo que trató al joven hasta julio de 2019.

-$225 de gastos al Dr. Héctor Cot psicólogo que trató al joven | Juan en mayo y junio de 2017 y agosto de 2019;

-$1,390.15 por recetas y deducibles de medicamentos

4. El costo del plan médico del joven Juan mientras estudió en la Universidad Católica ascendió a $555.96. Esta suma dividida en 7 meses (de enero a julio de 2017)[22] equivale a $79.42 mensual.

5. Hubo comunicaciones entre el padre y el joven sobre el plan médico que debía tener Juan, luego de haberse emitido la Resolución de 4 de mayo de 2017, a consecuencia de dicha Resolución.

6. El costo de los libros de Juan asciende a $802.34 por el periodo entre enero de 2017 a diciembre de 2019.[23] Esta suma de $802.34 dividida en 36 meses asciende a $22.29 mensual.

7. El joven Juan tuvo varios planes médicos desde agosto de 2017 hasta diciembre de 2019, los cuales tuvieron un costo total de $5,303.11. Esta suma divida en el término de 29 meses, esto es, desde agosto de 2017 a diciembre de 2019 asciende a gastos de planes médicos $182.87 mensuales.

8. Los planes médicos que tuvo Juan desde agosto de 2017 hasta diciembre de 2019 fueron:

- De agosto de 2017 a noviembre de 2017 tuvo el plan de Obama Care a un costo de $816.80.

- Desde noviembre de 2018 a diciembre de 2018 Juan tuvo un plan médico de Triple SSS a un costo de $301.40

- Desde enero a diciembre de 2019 Juan tuvo el plan médico Keystone Health a un costo de $4,184.91.

9. Juan solicitó y obtuvo tres préstamos durante sus periodos de estudio.

10. De agosto a mayo de 2018 Juan tomó un préstamo Sali [sic] Mae de $25,000. Al 28 de agosto de 2023 este préstamo tenía un balance de $36,099.

11. De agosto 2017 a diciembre de 2019 Juan tomó un préstamo de Federal Direct Loan ascendente a $12,000. Al 28 de agosto de 2023 este préstamo tenía un balance de $12,750.

12. De enero a diciembre de 2019 Juan tomó un préstamo Sali Mae de $19,000.[24] Al 28 de agosto de 2023 este préstamo tenía un balance de $25,119.

---

[22] Se hizo el cómputo a base de 7 meses toda vez que las partes estipularon que el plan médico era por ese periodo.
[23] El padre informó que está en disposición de pagar esta suma de los libros.
[24] Aunque durante la vista de 29 de agosto de 2023 se estipuló que el préstamo era de $18,000 en la vista de 24 de octubre se enmendó para que surgiera que este préstamo fue de $19,000.

13. En su origen u originación el total de los tres préstamos asciende a $55,000 ($25,000+$12,000+$18,000).

14. Al 28 de agosto de 2023 el balance de los tres préstamos, incluyendo los intereses asciende a $73,968 ($36,099+$12,750+25,119).

15. La matrícula de Juan de agosto a diciembre de 2017 ascendió a $14,209.

16. La matrícula de Juan de enero a mayo de 2018 ascendió a $14,209.

17. En la matrícula de enero a mayo de 2018 se le impuso a Juan un cargo por | matrícula tardía (late registration fee) adicional ascendente a de $100.

18. La matrícula de Juan de enero a mayo de 2019 ascendió a $14,533.

19. A Juan se le concedió una beca (Pell Grant) de $373 en la matrícula de enero a mayo de 2019.

20. De enero a mayo de 2019 se le concedió otra beca (SEOG Grant) de $1,000.

21. Descontadas las becas concedidas de enero a mayo a la matrícula, el total final de la matrícula fue $13,160.

22. En la matrícula de enero a mayo de 2019 se le impuso a Juan un cargo por matrícula tardía (late registration fee) adicional de $100.

23. La matrícula de Juan de agosto a diciembre de 2019 fue $14,951.

24. Durante el semestre de agosto a diciembre de 2019 Juan recibió beca (Pell grant) por la suma de $3,098. Descontada la beca a la matricula, la matrícula final de agosto a diciembre fue de $11,853.

25. Las sumas de las matrículas entre agosto de 2017 y diciembre de 2019, descontadas las becas fue $53,431:

-$14,209 agosto a diciembre 2017

- $14,209 enero a mayo de 2018

-$13,160 enero a mayo de 2019

-$11,853 agosto a diciembre de 2019

26. El total de becas concedidas entre agosto de 2017 y diciembre de 2019 fue $4,471.[25]

  -  $1,000 enero a mayo de 2019

  - $373 enero a mayo de 2019

  - $3,098 agosto a diciembre de 2019

27. Entre agosto a diciembre de 2016 en la residencia donde residía el padre, vivían don Juan, su esposa y su otro hijo menor de edad.

28. Desde el 1 agosto al 2 de diciembre de 2016 el pago de la hipoteca donde residía el padre del joven tenía una hipoteca mensual de $3,454 mensual. Esta hipoteca era pagada por la esposa de don Juan.

---

[25] Ya estas sumas fueron descontadas en la sumatoria hecha de las matrículas.

29. Desde el 1 agosto al 2 de diciembre de 2016 los gastos del padre en la residencia donde habitaban eran los siguientes:

- Mantenimiento $476/4 = $119 mensuales

- Energía eléctrica $147/4= $36.75

-AAA $220/4 =$55

-Internet $80/4= $20

-Comida $409/4 =$102.25

- Cable TV $114/4 = $28.50

30. Juan se graduó de Temple University en diciembre de 2019.

31. Juan se graduó de Filosofía de Temple University.

32.El promedio de Juan en Temple fue de 2.43.

33.Los promedios individuales junto a la cantidad de créditos por semestre fueron:

a. Agosto a diciembre de 2017: promedio 2.75 con 16 créditos.

b. Enero a mayo 2018: promedio de 2.67 con 12 créditos.

c. Enero a mayo 2019: promedio de 3.00 con 15 créditos.

d. Verano 2019: promedio de 2.67 con 6 créditos.

e. Agosto a diciembre de 2019: promedio de 2.50 con 16 créditos.

34. Juan tuvo un promedio de 2.074 en la Universidad de la Católica a: diciembre de 2016.

35. Durante el semestre de enero a agosto de 2017 Juan tomó 15 créditos en la Universidad Católica.

36. En Dubuque los promedios individuales junto a la cantidad de créditos por semestre fueron:

a. De agosto a diciembre de 2014 Juan tuvo un promedio 3.03 con 13 créditos. Inicialmente comenzó con 16 créditos, pero terminó con 13 créditos.

b. De enero a mayo 2014: promedio de 3.14 con 14 créditos.

c. Juan tomó una clase en la Católica que fue transferida, de 3 créditos.

d. De agosto a diciembre de 2014 Juan tuvo un promedio de 2.93 con 14 créditos.

e. De enero a mayo de 2015 Juan tuvo un promedio de .45. Comenzó con 15 créditos y terminó con 4 créditos.

37. En Temple los promedios individuales de Juan junto a la cantidad de créditos por semestre fueron:

a. De agosto a diciembre de 2015 tuvo un promedio de .73 con 14 créditos.

b. De agosto a diciembre de 2017 un promedio de 2.75 con 16 créditos.

c. De enero a mayo de 2018 promedio de 2.67 con 15 créditos.

d. De enero a mayo de 2019 tiene un promedio de 3.00 con 15 créditos.

e. En verano de 2019 tuvo un promedio de 3.67 con 6 créditos.

f. En agosto a diciembre de 2019 un promedio de 2.50 con 19 créditos.

38. En la Universidad Católica los promedios individuales junto a la cantidad de créditos por semestre fueron:

a. De enero a mayo de 2016 Juan tuvo un promedio de 3.50 con 7 créditos.

b. En el verano de 2017 Juan tomó dos clases. En una de las clases tuvo un promedio de 1.00 y en la otra un promedio de .50.

c. De agosto a diciembre de 2016 tuvo un promedio de 1.41 con 17 créditos.

d. De enero a mayo de 2017 tomó 15 créditos.

Durante la vista de 24 de octubre de 2023 se estipuló en adición lo siguiente:

39. Los costos de plan médico, según estipulados, fueron cubiertos por la Sra. Mabel Pola.

40. Los costos de los libros, según estipulados, fueron cubiertos por la Sra. Mabel Pola.

La prueba oral desfilada consistió en el testimonio del apelado, el de la señora Pola Montero y del testimonio del señor Prieto Irizarry.

Una vez concluido el desfile de prueba, el foro primario solicitó a las partes Memorandos de Derecho en lo pertinente a si los préstamos estudiantiles debían o no considerarse ayuda y sobre la imputación de ingresos para determinar la capacidad económica de los progenitores en un caso de alimentos entre parientes, entre otros asuntos. El 2 de julio de 2024, el apelado presentó Memorando de Derecho y el 9 de julio de 2024, el apelante presentó su correspondiente Memorando de Derecho.

Mediante *Resolución* de 18 de julio de 2024, enmendada *nunc pro tunc* el 16 de agosto de 2024, el foro primario emitió *Resolución Enmendada* en la que declaró con lugar la petición de alimentos entre parientes presentada por el joven adulto Juan Francisco Prieto

Pola y concluyó que este era acreedor a dicha pensión. En su dictamen, tras adjudicar credibilidad al testimonio del apelado y evaluar la prueba testifical presentada el foro primario advino a las siguientes determinaciones de hechos probados;

**DETERMINACIONES DE HECHOS DEL TRIBUNAL**

Evaluada la prueba presentada durante la vista, se dio por creído y probado lo siguiente:

1. Juan hizo la petición de pensión entre parientes para continuar estudios toda vez que necesitaba el apoyo de sus padres para costear los mismos.

2. Al momento de hacer la petición Juan tenía necesidades que incluían plan médico para su tratamiento psicológico y psiquiátrico, matrícula, libros, y dinero para gastos diarios

3. Juan cumplió la mayoría de edad el 28 de julio de 2016.

4. Actualmente Juan cursa un Juris Doctor en la Escuela de Derecho de la Universidad Interamericana.

5. Juan trabaja actualmente como oficial Jurídico en un bufete legal

6. Juan se graduó de cuarto año de escuela superior en mayo de 2013.

7. Juan tenía la intención de realizar sus estudios universitarios en Estados Unidos con el aval y consentimiento de sus progenitores.

8. Al graduarse de escuela superior, siendo Juan menor de edad, tanto el Sr. Prieto como la Sra. Pola participaron activamente en la selección de las universidades de Juan.

9. El Sr. Prieto identificó una entidad llamada Cambridge Learning Center que asistía en la preparación de estudiantes para el proceso de ingreso a la universidad. Los progenitores de Juan contrataron los servicios de esta entidad para preparar a Juan para sus estudios universitarios en Estados Unidos,

incluyendo la toma de exámenes requeridos para la admisión. Como parte del proceso, le suministraban pruebas de personalidad, de compatibilidad y para brindarle dirección. También se evaluaron las notas de Juan y lo que quería estudiar, que en ese momento era ciencia, aunque Juan no tenía notas sobresalientes.

10. Para la evaluación de universidades, el Sr. Prieto y la Sra. Pola también contrataron una consejera académica para asistirlos en la selección de la universidad. Entre otras cosas, esta hacia recomendaciones de posibles Universidades en EU.

11. De las cuatro universidades finales que surgieron a raíz de esta evaluación, todas en Estados Unidos, la escogida fue Dubuque en Iowa.

12. El Sr. Prieto llevó a Juan a tryouts para determinar si podía ser ubicado en el equipo de soccer y también fue a Dubuque para instalarlo en la universidad.

13. Ambos progenitores estuvieron completamente involucrados en el proceso de estudios de Juan en Estados Unidos.

14. Al momento de comenzar estudios universitarios, la intención de Juan era comenzar y terminar estudios en Estados Unidos.

15. Cuando comenzó estudios, Juan comenzó a estudiar kinesiología. Su interés a largo plazo era estudiar medicina. Sin embargo, luego se cambió a biología

16. Aunque estaba teniendo un buen aprovechamiento, luego del primer semestre Juan entendía que no era la universidad adecuada por lo que decidió cambiarse. La madre también entendía que la ubicación, la distancia, la dificultad de llegar, la trayectoria, la temperatura y el ambiente no era el más propicio para Juan. La Sra. Pola avalaba que Juan se cambiara de universidad

17. El cambio de universidad fue consultado con el Sr. Prieto. Este estaba consciente de que eso iba a suceder. Ambos estuvieron de acuerdo.

18. Discutido el asunto con el consejero universitario, Juan decidió quedarse el segundo año en Dubuque pues entendía que el cambio sería mejor en el tercer año.

19. Para evaluar la nueva universidad Juan buscó los programas en varias universidades y contrató una college counselor, para la evaluación de las nuevas universidades.

20. Las tres universidades finalistas para el posible traslado de Juan fueron University of Arkansas, Oklahoma State University y Temple University. Como parte de su decisión de cambiar de Universidad Juan visitó dos de las tres universidades evaluadas.

21. Tanto el Sr. Prieto como la Sra. Pola se involucraron en el cambio de universidad. En agosto de 2015 el padre sabía de la intención de Juan de transferirse, conocía las dos universidades visitadas eran las opciones finales. De hecho, en el 2015 Juan visitó la Universidad de Arkansas con su padre el Sr. Prieto mientras que visitó la Universidad de Temple con la Sra. Pola.

22. Finalmente se escogió Temple University como la nueva Universidad. Juan decidió continuar en el programa de Neurociencias con enfoque de medicina deportiva o fisiatria. En ese momento su interés era medicina y su intención era culminar su programa en Temple.

23. **Los problemas de salud mental de Juan comenzaron durante el segundo año, manifestándose claramente en el cuarto semestre. El referido semestre Juan no salió bien académicamente a consecuencia de su situación de salud mental. Durante el semestre de enero a mayo de 2015 sus notas sufrieron.**

24. Cuando comenzaron sus problemas de salud mental, sus progenitores los: desconocían,

pues este los ocultó. Cuando finalmente Juan no pudo superar la depresión en la cual estaba sumergido, tuvo que informarles a sus progenitores lo que sucedía.

25. Durante el verano de 2015 Juan recibió psicoterapia con el Dr. Gomila en PR.

26. El padre conocía que Juan recibía psicoterapeuta con el Dr. Gomila.

27. En agosto de 2015 el psicólogo que atendía a Juan le dio de alta, le dio el visto bueno para a que el joven se regresara a sus estudios fuera de Puerto Rico y Juan regresó a Temple University.

28. Durante el semestre de agosto a diciembre de 2015 Juan no recibió tratamiento psicológico. Para diciembre de 2015, Juan atravesaba una depresión severa.

**29. Los progenitores, primero la madre y luego el padre, advienen en conocimiento que había fracasado el semestre de otoño de 2015. El plan de los progenitores de Juan era que este regresara a PR para atender la situación que atravesaba de salud mental. Luego de regresar a Puerto Rico, decidieron no enviarlo de vuelta a Estados Unidos para el semestre de enero de 2016 porque necesitaba tratamiento. Aunque Juan se resistió inicialmente a este plan porque se había pagado el lugar de vivienda y otras partidas en Estados Unidos, posteriormente aceptó que necesitaba ayuda.**

**30. Los progenitores y Juan decidieron que, para no desperdiciar tiempo educativo, Juan estudiaría en la Universidad Católica a tiempo parcial mientras recibía tratamiento de salud mental en PR. De esa manera podría adelantar en alguna medida sus estudios y tomar clases que podría solicitar convalidación en Temple.**

31. Fue el Sr. Prieto quien sugirió la Universidad Católica por entender que, por lo tardío de la matrícula, sería donde podría ser aceptado. **El Sr. Prieto informó además que prefería que Juan se quedara con él en su hogar**

**y no con sus abuelos maternos quienes también residían en Ponce, por ser éstos personas mayores.**

**32. El Sr. Prieto también hizo las gestiones para buscar la ayuda que Juan necesitaba en Ponce. Juan Franco visitó un médico que su el Sr. Prieto identificó, aunque posterior Juan identificó otros terapeutas que se ajustaban a su necesidad.**

33. **Juan recibió tratamientos con diferentes médicos durante el periodo que permaneció en Puerto Rico desde enero de 2016 en adelante.** Parte de su tratamiento se llevó a cabo en el área metropolitana a donde iba semanal o mensualmente según necesario. La mejoría de Juan fue un proceso gradual.[26]

34. **Juan estudió desde enero a diciembre de 2016 en la Universidad Católica.**

35. **Juan estuvo pernoctando en casa de su padre desde enero de 2016 hasta noviembre de 2016. Pernoctaba en la semana, durante días de clase. Subía a San Juan los jueves o viernes. Para ese tiempo recibía psicoterapia en San Juan. Luego se quedaba en San Juan hasta los domingos cuando regresaba a Ponce para resumir las clases de la semana.**

36. **Pernoctando en casa de su padre en el 2016, Juan decide hacer la petición de pensión entre parientes.**

37. **Al momento de reclamar la pensión entre pariente en 2016, Juan pernoctaba en casa de su padre.** Cuando el padre se enteró de la petición, llamó a Juan y le dijo que no lo quería ver, que se fuera de la casa antes de él regresar a la casa. A raíz de esto, Juan se fue a residir a casa de sus abuelos maternos.

**38. Después de noviembre de 2016, las comunicaciones entre Juan y el Sr. Prieto eran a través de abogados.**

---

[26]De hecho, Juan recibió tratamiento hasta por lo menos diciembre de 2019.

39. Mientras Juan estudiaba en Ponce y residía con padre, su madre era quien cubría necesidades, incluyendo comida, matricula, plan médico, carro para transportarse, gasolina, peaje, ropa, calzado, celular, comida, Internet del celular, medicamento, citas médicas, comida, educación y mesada. Cualquier otro gasto de vivienda que tuviese, Juan se comunicaba con su madre para el pago.

40. Lo único que le daba el padre durante el término que residía en su casa era hospedaje y las utilidades de la residencia.

41. Durante ese tiempo que el joven residía en Ponce con el padre, este no aportó a los gastos de comida de Juan fuera del hogar, ni a gastos de transportación.

42. **Durante el mes de diciembre de 2016, enero, febrero, marzo de 2017 el Sr. Prieto no hizo aportación económica a Juan.**

43. El padre de Juan conocía durante el periodo entre agosto a diciembre de 2016 y el periodo de enero y febrero de 2017 de su tratamiento. Juan se lo informó a su padre antes de irse de la casa en noviembre de 2016. Se lo hizo saber mediante abogados.

44. Juan tuvo un cambio de concentración, entrando en Biología. Posteriormente hizo un cambio a Artes y Filosofía con la intención de posteriormente entrar a la escuela de derecho. Entre enero y mayo de 2017 Juan estudió en la Universidad Católica.

45. **En mayo 2017 las partes informaron un acuerdo de pensión entre parientes, que fue recogido en la Resolución de 4 de mayo de 2017.**[27]

---

[27] El 4 de mayo de 2017 el Tribunal emitió una Resolución en la cual acogió unos acuerdos a los cuales habían llegado las partes. El acuerdo estableció, entre otras cosas:
-Que Juan estudiaba bachillerato en la Universidad Católica; El demandado pagaría la totalidad de los estudios de Juan, pagaría el costo de los estudios de bachillerato y $300 mensuales por concepto de pensión entre parientes, que el padre pagaría el costo de los estudios de bachillerato no cubierto por becas y ayudas económicas;
  -Que cualquier cambio, relacionado a los estudios de Juan, las partes podrían llegar a acuerdos y en ausencia de esto acudirían al tribunal;

46. Como resultado de los acuerdos de pensión entre parientes, a finales de mayo de 2017 Juan y el Sr. Prieto acudieron a la Oficina de Finanzas de la Universidad Católica. Una vez allí y en el proceso de llenar la FAFSA, el Sr. Prieto le pidió a Juan que llenara la misma con la información de este para que fuera más beneficioso por los ingresos que tenía el Sr. Prieto en ese momento. Sin embargo, Juan entendía que la información que tenía que incluirse en la FAFSA era la del padre custodio, o sea, la de su madre, y no deseaba mentir en la misma por ser un delito federal. Juan le informa que llamaría a madre. El joven procedió a comunicarse con su representante legal, el Ledo. Alfonso. Luego de la llamada el joven no llenó la solicitud y se fue de la oficina de finanzas.

47. **En ese semestre de enero a mayo de 2017, mientras estuvo en Ponce, había subido sus notas.**

48. **Juan le informó a la madre que regresaría a Temple, estudiaría en artes y continuaría derecho. Aunque la madre lo confronto porque llevaba más de dos años en ciencia, lo apoyó en su decisión.**

49. **La Universidad Católica tiene programa de Filosofía. Sin embargo, Juan tomó la decisión de continuar Artes y Filosofía en Temple toda**

---

- Que el demandado pagaría la totalidad del costo de los libros;
-Que Juan proveería la lista de los libros al padre para que este auscultara si puede adquirir los mismos de forma más económica, en un término de 10 días desde que se entregara la lista de libros;
-Que Juan proveería las calificaciones obtenidas todos los semestres y la matrícula;
-Que el demandado no se auto relevaría de pagar la pensión establecida;
-Que el demandado pagaría el plan médico incluido en la matrícula de la Universidad Católica, que el padre podría escoger otro plan médico siempre y cuando tenga incluido en la lista de proveedores los médicos que atienden al joven, así como los medicamentos que toma;
-Que en 10 días Juan proveería al demandado la certificación del plan médico con la cubierta vigente, los medicamentos que tomaba y los médicos que visitaba
-Que Juan sometería los documentos al demandado para poder solicitar alguna beca.
-Se señaló vista para atender las controversias restantes en el caso del caso.

**vez que se tardaría más en la Universidad Católica.**

50. Juan había discutido con sus médicos, poder resumir sus estudios en Temple. Ellos aprobaron la continuación de sus estudios fuera de Puerto Rico.

51. Juan regresó a estudiar a Temple en agosto de 2017. A esos efectos presentó moción en el Tribunal.

52. Para regresar a la universidad de Temple y continuar estudiando en dicha institución, Juan debía entregar las trascripciones de los cursos que había tomado fuera de la institución para que los mismos le fuesen convalidados. Llevó la transcripción de la Universidad Católica, incluyendo las notas de enero a mayo de 2017 y se reunió presencialmente con el *academic counselor* de la Universidad en el verano de 2017.

53. Cuando regresa a Temple Juan había recibido una combinación de psicoterapia y tratamiento farmacológico incluyendo drogas de antidepresivos y antipsicóticos, para ansiedad, y para ayudar con su enfoque.

54. Para 28 de junio de 2017 había sido admitido para readmisión. Juan le dijo a su padre en varias ocasiones que tenía intención de regresar a Estados Unidos cuando le dieran de alta.

55. La intención de Juan era volver a Temple. Fue por esa razón que lo que solicitó en Temple había sido un *leave of absence*.

56. Cuando Juan regresó a Puerto Rico para atender su salud mental, su intención era regresar a Estados Unidos a culminar sus estudios. Su intención fue transmitida a sus progenitores.

57. La Universidad de Temple le convalidó varios cursos que había tomado en la Universidad Católica.

58. Los gastos de Temple eran más altos que la Universidad Católica.

59. Juan Franco estudiaba en Temple durante el semestre de enero a mayo de 2018. En la primavera de 2018 Juan tuvo una recaída en la situación de salud mental. En medio de una crisis, fue necesario activar un protocolo de salud mental y Juan fue admitido a un hospital.

60. La Sra. Pola viajó a Estados unidos y estuvo dos semanas en Filadelfia atendiendo a Juan e incluso se reunió con el decano de estudiantes del Departamento.

61. Juan tuvo que interrumpir estudios el semestre de primavera de 2018 para atender su salud emocional. Por recomendación de sus terapeutas, Juan regresó a PR.

62. A raíz de esto permaneció el semestre de agosto a diciembre de 2018 en Puerto Rico. Dada la situación de salud mental de Juan, durante ese semestre los profesores y la Universidad de Temple le permitieron completar unos incompletos, aun estando en PR.

63. Durante el periodo de agosto a diciembre de 2018 Juan recibió tratamiento de salud mental.

64. **A partir de enero de 2019, los médicos autorizaron que regresara para completar estudios. Regresó a Temple en enero de 2019, donde continuó estudiando hasta diciembre de 2019, cuando completó un grado en filosofía y una concentración menor en economía.**

65. **Los periodos que tuvo promedios más bajos comparados con otros periodos son atribuibles a la condición de salud mental de Juan.**

66. Las diversas crisis de salud mental que sufrió Juan impedían su concentración, enfoque y causó incluso que este contemplara en muchas ocasiones quitarse la vida. El tratamiento de salud mental recibido por Juan incidió sobre su situación académica. El tratamiento fue la razón por la cual pudo aliviarse y terminar sus estudios.

67. La única razón por la cual se vio afectado los estudios de Juan fue por situaciones de salud. Su aprovechamiento se vio afectado por su situación de salud mental.

68. Juan proveía sus notas y documentos incluyendo lista de libros, facturas de médicos, a través de su abogado. Esto no fue controvertido por el padre durante su testimonio.

69. Antes de agosto de 2017 la matrícula de Juan era pagada con los $3,000 que se recibía de la pensión alimentaria (de la minoridad de Juan). Los demás gastos eran cubiertos por la Sra. Pola.

70. A partir de agosto de 2017 Juan y la Sra. Pola decidieron solicitar préstamos estudiantiles toda vez que la Sra. Pola estuvo desempleada en cierto momento y estaba entonces nuevamente comenzando a generar ingresos mediante contratos.

71. Las deudas de los préstamos tomados entre agosto de 2017 y diciembre de 2019 se realizaron por necesidades de estudio, para terminar su grado y solo se utilizaron para el pago de matrícula.

72. Parte de los préstamos tomados son federales y parte privados. Para los federales Juan no necesitó codeudor. Sin embargo, para el préstamo de Sally Mae requería codeudor y su madre es la codeudora.

73. De no haberse tomado los préstamos, Juan no hubiese podido pagar la matrícula. Estos préstamos fueron una necesidad para Juan.

74. El resto de los gastos de Juan los cubrió la Sra. Pola.

75. Juan requería un plan médico para recibir su tratamiento de salud mental.

76. Los planes médicos que Juan tuvo luego de la Resolución de mayo de 2017 fue para poder seguir el tratamiento de salud mental que le habían dado. Requirió plan médico tanto en Puerto Rico como en Estados Unidos para

recibir servicios de psicoterapeutas y psiquiatra y servicios de farmacia.

77. Los planes médicos que tuvo el joven tanto en PR como en EU fueron necesarios e indispensables para el tratamiento de salud mental de Juan.

78. Los planes médicos escogidos por Juan fueron unos adecuados para el tratamiento que requería y en atención a los médicos que le dieron tratamiento y lo estabilizaron en cada una de las ocasiones que requería atención, estabilización y seguimiento.

79. Para escoger los planes médicos utilizados por Juan, este y su madre evaluaron los costos de estos y las necesidades de Juan.

80. El tratamiento de psicoterapeuta y psiquiatría de Juan fue necesario para mantener su estabilidad y tuvo un efecto positivo en su área de estudios.

81. Juan trabajó en una compañía de catering para eventos cuando estaba en Estados Unidos. Realizaba alrededor de 3 eventos mensualmente. Fue un trabajo intermitente entre 2017 hasta 2019. Alrededor de $9 la hora. Trabajaba usualmente era un promedio de 4 y 7 horas. Estimamos que tuvo un ingreso de $2,970 por estos servicios.[28]

82. Durante el 2019 trabajó desde septiembre a noviembre de 2019 en un deli. Su horario era de 1-9 pm, los sábados y domingos a $11 la hora. Promediamos que generó $2,816.[29]

83. La Sra. Pola quedó desempleada en cierto momento entre 2016 y 2017.

84. Para el 2017 la Sra. Pola generó pocos ingresos. Ya para 2018 tenía, contratos de empleo por los que generaba aproximadamente $24,000 al año.

---

[28] Estimamos que trabajo 5 meses en 2017; 3 meses en 2018 y 12 meses en 2019 para un total de 20 meses. Promediamos 5.5 horas por cada evento, 3 eventos mensuales, a $9 la hora por 20 meses.

[29] Este promedio fue calculado a base de 16 horas los fines de semana a $11 la hora por 4 meses.

85. Los gastos de la Sra. Pola entre 2016 y finales de 2017 y parte del periodo de 2018 hasta septiembre de 2019 (sin tomar en cuenta los gastos que cubría de Juan) ascendían a $3,834 que se desglosan de la siguiente manera;

    a. $80 de agua

    b. $350 de electricidad

    c. $145 de Internet

    d. $140 de celular (pagaba el de Juan que ascendía a $110)

    e. $600 de automóvil de ella y $330 el de Juan Carlos. f. $1,364 de Hipoteca

    g. $460 de Mantenimiento de residencia

    h. $115 Seguro de vida

    i. $280 plan médico

    j. $100 de gasolina

    k. $200 compra

86. Durante el Huracán María en el 2017 el apartamento de la Sra. Pola sufrió daños a raíz del paso del Huracán María. Activó la moratoria solicitada al Banco. Debido a esto no tuvo que pagar el apartamento por varios meses entre el último trimestre de 2017 de 2017 *[sic]* y principios de 2018. Por lo que sus gastos en este periodo eran $2,470.

87. A finales de 2019, sus gastos aumentaron a $5,834 por los aumentos en las siguientes partidas;

    a. $500 de gasolina,

    b. $600 promedio de comida fuera y dentro de la casa,

    c. $1,200 promedio de peaje por los viajes a lugares de empleo.

88. A finales de 2019, el vehículo de Juan Franco ya no tenía deuda.

89. Durante el tiempo en que sus ingresos bajaron, la Sra. Pola utilizó el dinero que había ahorrado entre 2012 y 2016. Para enero de 2017 la Sra. Pola tenía ahorros de entre 65 y 80 mil dólares.

90. La Sra. Pola cubrió todos los gastos de Juan Franco en el 2017, incluyendo matrícula de la Universidad Católica que ascendió entre $10,000 y $11,000.

91. En el 2018 la Sra. Pola comenzó a tener contratos de trabajo nuevamente. Estos aumentaron a finales de 2019, cuando ya pudo cubrir sus gastos.

92. En el 2018 los contratos de la Sra. Pola ascendían a $40,000. Para finales de 2019 los contratos eran de entre $50,000 a $60,000.

93. En ese periodo de septiembre de 2016 a diciembre 2019, la madre cubrió sus necesidades económicas. Entre ellas, cubrió materiales, matrícula, hospedaje, ropa, comida, plan médico, libros, vivienda, carro trasportación (tren, uber, transporte aéreo), celular, internet del celular, mesadas, tratamiento médico, medicamentos, deducibles, de internet. (El internet estaba cubierto en hospedaje). También cubría en Puerto Rico línea de gas, transportación, internet, cable tv de apto, ropa, comida, celular, el carro que Juan mantenía en PR, gasolina y el seguro del carro.

94. A partir de mayo de 2017 a diciembre de 2019, cuando ya no había pensión alimentaria de menor, la Sra. Pola aportó todos los gastos de Juan. La matrícula fue cubierta con las becas concedidas y con préstamos excepto el costo de la Universidad católica en el 2017 que aportó aproximadamente $10,000 y otros $5,000 el último semestre de agosto a diciembre de 2019 toda vez que el préstamo solicitado no cubrió la matrícula.

95. Hasta julio de 2016 el Sr. Prieto trabajaba como gerente en una industria farmacéutica, Boehringer [sic].

96. El Sr. Prieto generaba $14,000 bruto mensuales en Boehringer.

97. Para julio de 2016 el Sr. Prieto fue cesanteado.

98. Como parte de la cesantía, el Sr. Prieto recibió cierta suma de dinero como liquidación.

99. Una vez cesanteado, el Sr. Prieto solicitó los beneficios de desempleo.

100. El Sr. Prieto recibió entonces $133 semanales como beneficio de desempleo.

101. El Sr. Prieto llegó a un al acuerdo de pensión entre parientes el 4 de mayo de 2017.

102. Una vez llega a este acuerdo en mayo de 2017 el Sr. Prieto fue contratado como administrador del Centro de Cáncer de la Mujer y comienza a generar ingresos en mayo de 2017.

103. El Sr. Prieto no tenía impedimento alguno para generar ingresos de hasta $13,000 o $14,000 una vez fue cesanteado de su empleo.

104. El Sr. Prieto dejó de recibir los beneficios de desempleo en mayo de 2017.

105. El estilo de vida del Sr. Prieto no cambio a pesar de su cesantía.

106. El Centro de Cáncer de la Mujer es una corporación cuya "dueña", según fue testificado por el Sr. Prieto, es la Dra. Di Marco Cerra, esposa del Sr. Prieto. Fue la esposa del Sr. Prieto quien contrató al Sr. Prieto en mayo de 2017 a través de la corporación.

107. La última vez que el Sr. Prieto reclamó desempleo fue en mayo de 2017.

108. Para la fecha en que el Sr. Prieto fue cesanteado ya el Centro de Cáncer de la Mujer le "pertenecía" a la esposa del Sr. Prieto.

109. Durante el periodo que el Sr. Prieto estuvo desempleado mantuvo los mismos gastos y su mismo estilo de vida que tuvo cuando estaba trabajando.

110. El salario asignado al Sr. Prieto en el Centro de Cáncer fue de $3,000 mensuales brutos, aproximadamente $21,000 neto *[sic]*. Este fue su salario asignado desde mayo de 2017 hasta enero de 2019. También fue provisto de un plan médico.

111. El salario del Sr. Prieto en el Centro de Cáncer de $3,000 fue establecido por su esposa.

112. En el 2019 el Sr. Prieto comenzó otro empleo adicional en Corporación Oncológica del Oeste (sic), administrando el mismo, por el cual generaba aproximadamente $4,909 adicionales.

113. En el 2016 el Sr. Prieto residía en la Calle Don Quijote en Ponce. Allí residía con su esposa Ana y otro de sus hijos de nombre Francesco.

114. El Sr. Prieto tiene otros dos hijos además de Juan: Gustavo de 19 años y Franchesco de 16 años.

115. Durante el 2016, 2017, 2018, 2019 la esposa del Sr. Prieto pagaba los gastos del hogar incluyendo: electricidad, agua, Internet, Cable TV, alimentos dentro del hogar, los alimentos del Sr, Prieto fuera del hogar, gastos de vivienda, mantenimiento.

116. Los gastos del Sr. Prieto entre 2017 y 2019 eran pagados por su esposa o por la corporación que presidía y/o administraba su esposa.

117. El Sr. Prieto, aunque no tenía vehículo a su nombre, utilizaba los vehículos que le proveía su esposa. Los vehículos que utilizaba el Sr. Prieto eran un Audi de 2016 o 2017, un Porche de 2015, y una guagua Maserati de 2018. Estos vehículos eran utilizados para asuntos de trabajo y para uso personal. La entidad cubría además sus gastos de gasolina, peaje y mantenimiento de los vehículos.

118. Como parte de sus funciones en el Centro de Cáncer, el Sr. Prieto maneja los clientes del centro y las cuentas a pagar y pagar los gastos del centro. A pesar de estas funciones, el Sr. Prieto adujo desconocer el pago mensual de los vehículos mencionados.

119. Como parte de sus beneficios en su empleo en el Centro de Cáncer el Sr. Prieto tenía acceso a recibir gastos de representación y el uso de una tarjeta de crédito. Con este beneficio, pagaba todas sus necesidades.

120. Los gastos aproximados del Sr. Prieto mientras estaba desempleado era de más de $3,000. Estos gastos excedían lo que generaba el Sr. Prieto de desempleo.

121. La posición en la oficina medica de su esposa es Administrador. Administra la oficina de su actual esposa.

122. El Sr. Prieto tenía la capacidad de generar ingresos de $14,000 durante los periodos de 2016, 2017, 2018 y 2019. El Sr. Prieto no tenía incapacidad para generar ingreso o trabajar.

123. Durante el periodo que el Sr. Prieto estuvo desempleado y hasta diciembre de 2019 el Sr. Prieto se mantenía participando en actividades sociales, actividades de gala, actividades de etiqueta, realizando viajes de placer, tanto a Florida, Carolina del Norte, Massachusetts, Texas en Estados Unidos como a Europa.

124. **Durante abril de 2017 a dic 2019 la única aportación que realizó el Sr. Prieto eran los $300 mensuales.**

A base de las anteriores determinaciones de hechos probados, en la *Resolución Enmendada,* el foro primario concluyó como cuestión de derecho, **que aún cuando surge de la evidencia que el apelado tuvo altos y bajos en su**

**vida académica, particularmente en sus índices académicos** y las clases tomadas durante sus semestres escolares, **el joven adulto Juan Franco Prieto Pola,** quien advino a la mayoridad el 28 de julio de 2016, **cumplía con los criterios para ser acreedor a una pensión alimentaria desde abril de 2017 hasta julio de 2019.**

El foro primario atribuyó la falta de progreso académico a los problemas de salud mental por los que atravesó el apelado y declaró con lugar la petición de alimentos entre parientes presentada por este. Así las cosas, **el TPI ordenó al señor Prieto a pagar la pensión entre parientes de la siguiente manera: $576.33 desde abril a julio de 2017; $2,477.46 desde agosto de 2017 a agosto de 2019; $1,443.46 desde septiembre de 2019 a julio de 2019.** De estas sumas se deducirían las sumas de $300.00 que continuó pagando el apelante.

Destacó además, el TPI que tuvo que escuchar horas de testimonio sobre la situación de salud mental del apelado, cuando dicho asunto podía fácilmente estipularse y que el señor Prieto Irizarry conocía que el apelado tuvo varios incidentes de salud mental y lo asistió en la búsqueda de terapeuta. Igualmente, el TPI concluyó que surge de los hechos estipulados y del testimonio del señor Prieto Irizarry que este no pagaba ninguno de los elementos por los cuales solicita crédito.

De otra parte, **en lo pertinente al periodo de junio de 2016 a noviembre de 2016, el TPI concluyó que a pesar de que el joven adulto Juan Carlos Prieto Irizarry estuvo pernoctando durante ese periodo en casa de su padre, el apelante no tiene derecho a crédito**

**alguno ya que no proveyó a su hijo nada adicional** y fue la señora Pola quien cubría las necesidades del apelado.

En la *Resolución Enmendada* el TPI hizo constar que le dio credibilidad al testimonio de la señora Pola, en cuanto a que tuvo pérdida de ingresos y que utilizó sus ahorros para cubrir sus necesidades y todos los gastos médicos, educativos y de diario que su hijo requería. Asimismo el TPI atribuyó credibilidad al testimonio del apelado y no le confirió credibilidad al testimonio del señor Prieto Irizarry.

Finalmente, el foro primario impuso al señor Prieto Irizarry la suma de $12,000 por concepto honorarios de abogado, al concluir que el Apelante fue temerario. Razonó el TPI que el señor Prieto Irizarry no asistió adecuadamente al Tribunal en el proceso, lo que llevó al foro primario a tener que escudriñar el expediente para evaluar nuevamente los argumentos y verificar las determinaciones ya emitidas en el caso mediante Resoluciones y minuta-resoluciones.

Inconforme, el señor Prieto Irizarry compareció ante nos mediante el recurso de epígrafe y señala la comisión de los siguientes errores por parte del foro primario:

1. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SAN JUAN, AL ESTABLECER UNA PENSIÓN DE ALIMENTOS ENTRE PARIENTES A FAVOR DE JOVEN ADULTO CONTRARIA A LA PRUEBA DESFILADA Y AL DERECHO APLICABLE.

2. ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SAN JUAN, AL NO RECONOCER CRÉDITOS A FAVOR DEL PADRE DEMANDADO-APELANTE, PROCEDENTES EN DERECHO, Y AL NO IMPUTARLE PROPORCIÓN Y/U OBLIGACIÓN ALGUNA EN LA PENSIÓN DE ALIMENTOS ENTRE PARIENTES A LA MADRE DEMANDADA.

3. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SAN JUAN, AL

DICTAR UNA RESOLUCIÓN SOBRE ALIMENTOS ENTRE PARIENTES CONSIDERANDO PARTIDAS Y GASTOS QUE NO PROCEDEN EN DERECHO Y/O QUE NO FUERON INCURRIDOS POR EL JOVEN ADULTO AQUÍ APELADO.

4. ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SAN JUAN, AL DETERMINAR QUE LOS PRÉSTAMOS ESTUDIANTILES NO SON AYUDAS ECONÓMICAS PARA JOVEN ESTUDIANTE, Y A PESAR DE QUE NO HAN SIDO PAGADOS POR EL JOVEN ADULTO NI LA MADRE-DEMANDANTE.

5. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SAN JUAN, AL HACER DETERMINACIONES DE HECHOS CONTRARIAS AL DERECHO VIGENTE.

6. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SAN JUAN, AL HACER DETERMINACIONES DE HECHOS CONTRARIAS A DICTÁMENES ANTERIORES Y ADMISIONES DE LA PARTE INTERVENTORA-APELADA DURANTE EL PROCEDIMIENTO.

7. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SAN JUAN, AL DICTAR RESOLUCIÓN Y ORDEN DEJANDO INCIDENTALMENTE Y DE MANERA ARBITRARIA Y SUMARIA, SIN EFECTO RESOLUCIÓN Y ORDEN FINAL Y FIRME DEL 23 DE SEPTIEMBRE DE 2021; Y ATENDER CONTROVERSIAS DENEGADAS Y NO RECONSIDERADAS PREVIAMENTE, Y/O QUE HABRÍAN DE VENTILARSE EN LA VISTA EVIDENCIARIA, VIOLENTANDO ASÍ EL DEBIDO PROCESO DE LEY DEL APELANTE.

8. ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SAN JUAN, AL DETERMINAR (6) AÑOS DESPUÉS, QUE UN ACUERDO DE PENSIÓN DE PENSIÓN DE ALIMENTOS ENTRE PARIENTES RECOGIDO EN RESOLUCIÓN DE 4 DE MAYO DE 2017, FUE UNO PROVISIONAL Y NO FINAL.

9. ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SAN JUAN, AL IMPONER UNA SUMA DE $12,000.00 POR CONCEPTO DE TEMERIDAD, SIN TOMAR EN CONSIDERACIÓN INCUMPLIMIENTOS DEL; APELADO E INCIDENTES PROCESALES AJENOS AL APELANTE.

El 27 de diciembre de 2024, el señor Prieto Pola presentó *Alegato en Oposición.* En ajustada síntesis, este sostiene que si bien las partes alcanzaron un acuerdo de pensión entre parientes, las circunstancias del apelado cambiaron, su relación con el apelante se deterioró al punto de que no tenían comunicación y tuvo que tramitar su solicitud de modificación de alimentos entre parientes en julio de 2017 a través de los

abogados. Asimismo, el apelado arguye que a partir de agosto de 2017 al presente ha tenido que procurar aquello a lo que tiene derecho a recibir de su padre en cuanto a aportaciones a sus gastos universitarios, correspondiente al periodo de agosto de 2017 a diciembre de 2019, mediante el proceso judicial. Arguye, además, que el apelado que la determinación del foro primario sobre la capacidad económica del apelante merece deferencia y solicitó la imposición de sanciones en apelación por una suma no menor de $8,000.00.

El 6 de marzo de 2025, celebramos vista argumentativa a la que comparecieron el señor Prieto Irizarry, y el señor Prieto Pola con sus respectivos abogados, así como la señora Pola Montero, por derecho propio. Entre varios asuntos se aclaró que luego de la vista de 4 de mayo de 2017, sobre acuerdos entre las partes, no se celebró vista alguna ante el foro primario para acreditar que el apelado cumplía con los requisitos estatutarios y jurisprudenciales para ser acreedor a alimentos entre parientes mientras concluía sus estudios universitarios a nivel subgraduado en otra institución, a partir de julio de 2017, luego de su solicitud de modificación de pensión en esa fecha. De igual forma, las partes aclararon que tampoco desfiló prueba pericial que estableciera la alegada condición de salud mental del apelado a la que este y el foro primario atribuyeron la falta de aprovechamiento académico y de aptitud para los estudios.

El 25 de abril de 2025, antes de estipular las transcripciones de las vistas, el apelado presentó *Alegato Suplementario*… Allí expuso que es acreedor de la

pensión entre parientes; que sus necesidades están debidamente justificadas y que los medios de su progenitor son suficientes para proveerle la pensión entre parientes solicitada.

El 28 de abril de 2025 el señor Prieto Irizarry presentó ante nos *Alegato Suplementario* (*Discutiendo los Puntos Argumentados en Vista del 6 de marzo de 2025*). Allí reitera que el hijo mayor de edad está obligado a probar las circunstancias que le hacen acreedor a los alimentos entre parientes y que como padre del apelado siempre estuvo en disposición de aportar a los gastos de matrícula de la Pontificia Universidad Católica de Puerto Rico que no fueran cubiertos por becas, ni ayudas económicas, más el apelado decidió matricularse en otra institución universitaria mucho más costosa, que excedía de las capacidades económicas del padre. De igual forma, el apelante argumenta que si bien el TPI incluyó determinaciones de hechos sobre los ingresos de cada progenitor de ninguna de las determinaciones de hechos del foro primario surge que el TPI hubiera realizado algún cómputo sobre ingresos y capacidad económica de cada uno de los progenitores, ni que hubiese establecido y adjudicado algún porciento o proporción a cada uno de éstos.

Finalmente, el 30 de abril de 2025, el apelante presentó ante nos *Moción Sometiendo Transcripción de Vistas en Cumplimiento de las Disposiciones del Reglamento del Tribunal de Apelaciones.*

Posteriormente, el 9 de mayo de 2025 compareció igualmente el apelante mediante *Alegato Suplementario (Sobre Cuestiones de Hechos y Errores en la Apreciación*

*de la Prueba).* En esencia, sostiene el apelante que incidió el foro primario al no concederle los créditos reclamados a pesar de haber desfilado prueba que demostró que de enero a noviembre de 2016 el apelado pernoctaba toda la semana en casa del padre en Ponce mientras cursaba estudios universitarios en la Pontificia Universidad Católica. Arguye además, el apelante que de las estipulaciones sobre los periodos de estudio en cada una de las universidades y los promedios del apelado, surge su bajo aprovechamiento académico y la falta de continuidad y certeza sobre lo que le interesaba estudiar, lo que igualmente, quedó validado con su propio testimonio. En esencia, sostiene que también con su testimonio quedó validado que el apelado tuvo al menos tres cambios de concentraciones, con bajos promedios, bajas, incompletos y que no mantenía informado al apelante sobre su bajo aprovechamiento académico. Puntualiza el apelante que lo anterior surge de la transcripción de la vista celebrada el 30 de agosto de 2023, página 78, líneas 17-20; página 100 y 101, líneas 10-25; transcripción de la vista de 23 de octubre de 2023, página 33, líneas 12-16; página 34, líneas 8-13; página 39, líneas 10-15; página 41, página 44, líneas 9-25; página 45. Líneas 1-13; página 63, líneas 22-25; página 64, página 65, página 80, líneas 1-8; página 81, líneas 1-25; página 86, líneas 12-22; página 104, líneas 1-5; página 18, líneas 13-19; página 33, líneas 12-16; transcripción en la vista de 6 de mayo de 2024, página 225, línea 19; página 226, línea 8.

De igual forma, el apelante sostiene sobre los acuerdos de la estipulación entre las partes del 4 de mayo de 2017, el apelado reconoció ante el foro primario

que no notificó la transcripción de las notas del semestre de enero a mayo de 2017 que obtuvo mientras cursaba estudios en la pontificia Universidad Católica, contrario a lo estipulado y en incumplimiento con los criterios necesarios para ser acreedor a los alimentos entre parientes. Asimismo, el apelante destaca que el apelado reconoció ante el TPI que no incluyó que siempre era su intención regresar a estudiar a Temple University, lo que surge de la Transcripción de la Vista de 23 de octubre de 2023, página 104, líneas 1-5; página 110, líneas 24-24, hasta página 111, línea 3; página 113, línea 19; Transcripción de la vista de 6 de mayo de 2024, página 2236, línea 1. Enfatiza el apelante que luego del acuerdo de mayo de 2017 y la Resolución que recogió el mismo, el apelado nunca le informó su interés de regresar a estudiar a Temple University. (Transcripción de la vista celebrada el 23 de octubre de 2023, página 246, líneas 6-18.

Examinados los escritos de las partes, sus respectivos anejos, así como la transcripción de la prueba oral desfilada ante el foro primario, estamos en posición de resolver.

-II-

**A. Alimentos entre Parientes**

El Artículo II, Sección 7 de la Constitución del Estado Libre Asociado de Puerto Rico reconoce el derecho a la vida como un derecho fundamental. Art. II, Sec. 7, Const. ELA, LPRA, Tomo 1. El derecho a reclamar alimentos constituye parte del derecho a la vida, protegido por nuestra Carta Magna. *Torres Rodríguez v. Carrasquillo Nieves*, 177 DPR 728, 738 (2009).

El Artículo 653 del Código Civil el término de alimentos como, "todo lo que es indispensable para el sustento, la vivienda, la vestimenta, la recreación y la asistencia médica de una persona, según la posición social de la familia". (31 LPRA sec. 7531). El referido artículo establece, además, que cuando el alimentista es menor de edad, los alimentos comprenden también su educación, las atenciones de previsión acomodadas a los usos y a las circunstancias de su entorno familiar y social y los gastos extraordinarios para la atención de sus condiciones personales especiales. *Íd.*

En lo concerniente a hijos mayores de edad, emancipados o no sujetos a la patria potestad y custodia de uno de sus padres, la obligación de proporcionar alimentos antes del año 2020 emana del **Artículo 143 del Código Civil de 1930**, 31 L.P.R.A. sec. 562, donde se consignó el deber general de los parientes de socorrerse mutuamente. *Rivera et al. v. Villafañe González,* 186 D.P.R. 289, 294 (2012) (Sentencia); *Key Nieves v. Oyola Nieves*, 116 D.P.R. 261, 264 (1985). El hecho de que los hijos pudieran comparecer a solicitar alimentos aún luego de alcanzar la mayoridad obedece a que la obligación de alimentarlos no cesa automáticamente porque estos hayan cumplido veintiún (21) años. *Santiago, Maisonet v. Maisonet Correa,* 187 D.P.R. 550, 573 (2012); *Key Nieves v. Oyola Nieves*, supra*,* a la pág. 266.

No obstante, ese tipo de obligación requiere que el hijo ya mayor de edad tenga la necesidad de esa pensión alimentaria, lo que se analiza bajo criterios distintos a los que se toman en cuenta cuando se adjudican los alimentos de un menor. *Rodríguez Amadeo v. Santiago*

*Torres*, 133 D.P.R. 785, 794 (2000). Por lo tanto, este viene obligado a probar las circunstancias que le hacen acreedor de los alimentos. *Santiago, Maisonet v. Maisonet Correa,* supra.

En los casos en que el menor ha comenzado los estudios universitarios mientras es menor de edad, se ha establecido que bajo circunstancias normales: "...al menos en cuanto a los estudios de bachillerato... [o] ...cuando un hijo se ha iniciado en un oficio o carrera durante la minoridad, tiene derecho a exigir que el alimentante le provea los medios para terminarlo, aun después de haber llegado a la mayoridad". *Key Nieves v. Oyola*, supra. Es, pues, una norma bien establecida que un tribunal puede ordenar el pago de alimentos y abono a estudios a favor de un hijo mayor de edad que haya comenzado sus estudios durante su minoridad y **continúe los mismos con buen aprovechamiento, demostrando que tiene necesidad de ayuda económica.** *Key Nieves v. Oyola Nieves,* supra*; Guadalupe Viera v. Morell,* 115 D.P.R. 4, 14 (1983).

Ahora bien, la situación particular que representan los estudios postgraduados, como maestrías o doctorados, y el estudio de aquellas profesiones que requieren en exceso de los cuatro (4) años de bachillerato amerita una consideración especial y separada que, como regla general, tendrá que ser resuelta de acuerdo a los hechos particulares de cada caso. *Key Nieves v. Oyola Nieves*, supra, a las págs. 266-267.

El hijo que solicita alimentos o asistencia económica para estudios "postgraduados" deberá demostrar afirmativamente que es acreedor de tal asistencia

económica mediante la actitud demostrada por los esfuerzos realizados, la aptitud manifestada para los estudios que desea proseguir a base de los resultados académicos obtenidos y la razonabilidad del objetivo deseado. Únicamente luego de que todas las anteriores circunstancias o criterios hayan sido acreditados a satisfacción del tribunal es que dicho foro podrá fijar aquella suma de dinero que por concepto de "alimentos" entienda procedente y razonable y, de ser necesario, utilizar su poder coercitivo para obligar al alimentante a cumplir con los mismos. *Rodríguez Amadeo v. Santiago Torres*, supra; *Key Nieves v. Oyola Nieves,* supra*,* a las págs. 267-268.

De igual forma, para ser merecedor de estos beneficios, es indispensable demostrar aptitud para los estudios a la par de aprovechamiento académico. No visualiza el Código Civil una obligación alimentaria frente a un alimentista quien, a pesar de su preparación, opta por no ocuparse provechosamente y prefiere la ociosidad en su lugar. *Rodríguez Amadeo v. Santiago Torres*, supra*,* a la pág. 797.

La determinación que corresponda, con respecto al pago de alimentos a los hijos mayores de edad que deseen proseguir estudios graduados o postgraduados está condicionado, por supuesto, a que el alimentista demuestre tanto su necesidad económica, como la capacidad de pago del alimentante conforme el principio de proporcionalidad pautado por el Artículo 146 del Código Civil, 31 L.P.R.A. sec. 565. Véase, *Argüello v. Argüello*, 155 D.P.R. 62, 72 (2001); *Chévere v. Levis*, supra*,* a la pág. 534; *Rodríguez Avilés v. Rodríguez Beruff*, supra. En lo atinente a la cuantía de la pensión

a adjudicarse, la suma que corresponde pagar deberá ser proporcional a los recursos del que los da y a las necesidades del que los recibe, y se reducirá o aumentará en proporción a los recursos del primero y las necesidades del segundo. *Fonseca Zayas v. Rodríguez Meléndez*, 180 D.P.R. 623, 634 (2011); *Martínez v. Rodríguez*, 160 D.P.R. 145, 153 (2006); *Argüello v. Argüello*, supra. Además, debe tenerse presente la prioridad, sobre los recursos disponibles, de las necesidades de los hijos que todavía sean menores de edad y estén cursando estudios primarios o a nivel de bachillerato. *Key Nieves v. Oyola Nieves,* supra*, a la pág. 267.

De otra parte, el Artículo 147 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 566, dictamina que la obligación de sufragar alimentos surge desde el momento en que se reclama judicialmente su pago. *Chévere v. Levis*, supra; *Rodríguez Avilés v. Rodríguez Beruff*, supra*, a la pág. 622.

Cónsono con lo anterior, el Artículo 655 del Código Civil de 2020, (31 LPRA sec. 7533) establece lo siguiente:

> [s]i el alimentista alcanza la mayoridad mientras cursa ininterrumpidamente estudios profesionales o vocacionales, la obligación de alimentarlo se extiende hasta que obtenga el grado o título académico o técnico correspondiente **o hasta que alcance los veinticinco (25) años** de edad, **lo que ocurra primero, a discreción del juzgador y dependiendo las circunstancias particulares de cada caso.**
> **El tribunal, en atención a las habilidades personales, el potencial de desarrollo y el aprovechamiento académico del alimentista, puede establecer la cuantía, el modo y el plazo de la obligación**.
>
> (Énfasis suplido)

Asimismo, el Artículo 658 del Código Civil de 2020 (31 LPRA sec. 7541) regula todo lo relacionado a las pensiones alimentarias entre parientes y dispone, entre otras cosas, que, "[e]stán obligados recíprocamente a proporcionarse alimentos, en toda la extensión que señalan los artículos precedentes: (a) los cónyuges; (b) los ascendientes y descendientes; (c) los hermanos".

Así, la cuantía de los alimentos debidos al mayor de edad debe ser proporcional a los recursos del alimentante y a las necesidades del alimentista. Artículo 665 del Código Civil (31 LPRA sec. 7561). Al estimar los recursos de uno y de otro se toma en cuenta el patrimonio acumulado, el potencial de generar ingresos, los beneficios directos e indirectos que recibe de terceras personas, el perfil de sus gastos que no son indispensables y su estilo de vida.

Así pues, la obligación de sufragar los estudios de un hijo no cesa automáticamente cuando este adviene a su mayoría de edad. *Rivera v. Villafañe González*, 186 DPR 289, 294 (2012). Según ha resuelto nuestro máximo Foro, **en aquellos casos en que el alimentista haya iniciado sus estudios universitarios a nivel de bachillerato durante su minoría de edad, como regla general, tendrá derecho a exigir de sus progenitores que le provean los medios necesarios para concluir dicha etapa educativa, aun luego de haber llegado a la mayoridad.** Íd., pág. 295. Véase, además, *Argüello v. Argüello*, 155 DPR 62 (2001); *Key Nieves v. Oyola Nieves*, 116 DPR 261 (1985).

De otro lado, la obligación alimentaria necesariamente varía cuando se trata de alguien quien, ya siendo mayor de edad, interesa iniciar estudios postgraduados. *Rivera v. Villafañe González,*

*supra.* Así, este tipo de reclamación conlleva un análisis basado en consideraciones diferente que exigen ser evaluadas individualmente conforme a los hechos que se presenten en cada caso. *Argüello v. Argüello*, *supra.*

Es decir, **la situación particular que representan los estudios postgraduados, como maestrías o doctorados, y el estudio de aquellas profesiones que requieren <u>en exceso de los cuatro años de bachillerato amerita una consideración especial y separada que</u>, <u>como regla general</u>, <u>tendrá que ser resuelta de acuerdo con los hechos particulares de cada caso</u>**. *Rivera v. Villafañe González, supra.* Véase, además, *Key Nieves v. Oyola Nieves*, *supra*. Sin embargo, **para ser merecedor de estos beneficios es indispensable demostrar aptitud para los estudios, a la par con el aprovechamiento académico**. *Rivera v. Villafañe González, supra.*

También, el Tribunal Supremo ha resuelto que el hijo que solicite alimentos o asistencia económica para estudios postgraduados deberá demostrar afirmativamente que es acreedor de tal asistencia económica mediante la actitud demostrada por los esfuerzos realizados, la aptitud manifestada para los estudios que desea proseguir a base de los resultados académicos obtenidos y la razonabilidad del objetivo deseado. *Key Nieves v. Oyola Nieves*, *supra,* pág. 267.

### B. Honorarios de Abogado

La Regla 44.1(d) de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1, establece que "[e]n caso que cualquier parte o su abogado o abogada haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al o a la responsable el pago de una suma por

concepto de honorarios de abogado que el tribunal entienda corresponda a tal conducta. [...]". Lo anterior quiere decir que, si el tribunal sentenciador determina la existencia de temeridad, la imposición de honorarios es imperativa. *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 211 (2013).

La temeridad es aquella conducta que haga necesario un pleito que se pudo evitar, que lo prolongue innecesariamente o requiera a la otra parte efectuar gestiones innecesarias. *Maderas Tratadas v. Sun Alliance et al.*, 185 DPR 880, 925 (2012). El propósito de la imposición de honorarios de abogado en casos de temeridad es penalizar a un litigante perdidoso que, por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito. *Andamios de P.R. v. Newport Bonding*, 179 DPR 503, 520 (2010). Además, la imposición de temeridad tiene el propósito de disuadir la litigación innecesaria y alentar las transacciones mediante la imposición de sanciones a la parte temeraria para compensar los perjuicios económicos y molestias sufridas por la otra parte. *Blás v. Hosp. Guadalupe*, 146 DPR 267, 335 (1998).

Según el Tribunal Supremo, existe temeridad en las siguientes instancias: 1) contestar una demanda y negar responsabilidad total, aunque se acepte posteriormente; 2) defenderse injustificadamente de la acción; 3) creer que la cantidad reclamada es exagerada y que sea esa la única razón que se tiene para oponerse a las peticiones del demandante sin admitir francamente su responsabilidad, pudiendo limitar la controversia a la

fijación de la cuantía a ser concedida; 4) arriesgarse a litigar un caso del que se desprendía prima facie su responsabilidad y 5) negar un hecho que le conste es cierto a quien hace la alegación. *C.O.P.R. v. S.P.U.*, 181 DPR 299, 342 (2011). La evaluación de si ha mediado o no temeridad recae sobre la sana discreción del tribunal sentenciador y sólo se intervendrá con ella en casos en que dicho foro haya abusado de tal facultad. *PR Fast Ferries et al. v. AAPP,* 2023 TSPR 121, 213 DPR ___ (2023).

Ahora bien, la temeridad es improcedente en aquellos litigios que contienen controversias complejas y novedosas aun no resueltas en nuestra jurisdicción o cuando la parte concernida responde a lo que resulta ser una apreciación errónea del derecho. *Meléndez Vega v. El Vocero de PR*, supra, pág. 212.

### C. *Apreciación de la Prueba*

El Tribunal Supremo de Puerto Rico ha puntualizado reiteradamente que los tribunales apelativos no debemos intervenir con la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos de los tribunales de primera instancia. *E.L.A. v. S.L.G. Negrón-Rodríguez*, 184 D.P.R. 464, 486 (2012); *Serrano Muñoz v. Auxilio Mutuo*, 171 D.P.R. 717, 741 (2007).

La Regla 42.2 de Procedimiento Civil, 32 L.P.R.A. Ap. V R. 42.2, expresamente dispone que las determinaciones de hechos de los tribunales de instancia basadas en testimonio oral, no se dejarán sin efecto a menos que sean claramente erróneas y que se debe dar consideración a la oportunidad que tuvo el tribunal

sentenciador para juzgar la credibilidad de los testigos. Esta deferencia hacia el foro primario responde al hecho de que el juez sentenciador es el que tiene la oportunidad de recibir y apreciar toda la prueba oral presentada, de escuchar la declaración de los testigos y evaluar su *demeanor* y confiabilidad. *Suárez Cáceres v. Com. Estatal Elecciones*, 176 D.P.R. 31, 67 (2009); *López v. Dr. Cañizares*, 163 D.P.R. 119, 135 (2004).

El juez ante quien declaran los testigos es quien tiene la oportunidad de verlos y observar su manera de declarar, apreciar sus gestos, titubeos, contradicciones y todo su comportamiento mientras declaran; factores que van formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad. *Suárez Cáceres v. Com. Estatal Elecciones*, supra, a la pág. 68. Así, le compete al foro apelado la tarea de aquilatar la prueba testifical que ofrecen las partes y dirimir su credibilidad. *González Hernández v. González Hernández,* 181 D.P.R. 746, 776-777 (2011); *Sepúlveda v. Depto. de Salud*, 145 D.P.R. 560, 573 (1998).

Ahora bien, la doctrina de deferencia judicial no es de carácter absoluto, pues la misma debe ceder ante las posibles injusticias que puedan acarrear unas determinaciones de hechos que no estén sustentadas por la prueba desfilada ante el foro primario. *Pueblo v Irizarry,* 156 D.P.R. 780, 797, 798 (2002). Así, como foro apelativo, podemos intervenir con la apreciación de la prueba oral que haga el Tribunal de Primera Instancia, cuando el foro primario actúe con pasión, prejuicio o parcialidad, o incurra en un error manifiesto al aquilatarla. *González Hernández v. González Hernández,*

supra*; Rivera Figueroa v. The Fuller Brush Co.*, 180 D.P.R. 894, 916 (2011); *Meléndez v. Caribbean Int'l. News*, 151 D.P.R. 649, 664 (2000).

Además, se podrá intervenir cuando la apreciación de la prueba no represente el balance más racional, justiciero y jurídico de la totalidad de la prueba y cuando la apreciación de la misma se distancia "de la realidad fáctica o ésta [es] inherentemente imposible o increíble". *González Hernández v. González Hernández*, supra, a la pág. 777; *Pueblo v. Santiago et al.*, 176 D.P.R. 133, 148 (2009). Se exceptúan de la regla de deferencia las determinaciones de hechos que se apoyan exclusivamente en prueba documental o pericial, ya que los tribunales apelativos están en idéntica posición que el tribunal inferior al examinar ese tipo de prueba. *González Hernández v. González Hernández*, supra.

En síntesis, si no percibimos que el Tribunal de Primera Instancia haya cometido un error manifiesto en la aplicación del derecho, que haya indicios de pasión, prejuicio o parcialidad en la apreciación de la prueba, no nos corresponde sustituir su juicio por nuestras apreciaciones, basadas en un examen del expediente del caso, excepto si luego de realizar un balance racional, justiciero y jurídico de la totalidad de la prueba y de los documentos que obran en autos, llegamos a unas conclusiones distintas a las del Tribunal de Primera Instancia. *González Hernández v. González Hernández*, supra. Por esta razón, nuestra intervención con la evaluación de la prueba testifical realizada por el TPI solamente procederá en los casos en los que el análisis integral de dicha evidencia nos cause una insatisfacción

o una intranquilidad de conciencia a tal extremo que se estremezca nuestro sentido básico de justicia. *González Hernández v. González Hernández,* supra.

A tenor con los principios de derecho anteriormente reseñados, procedemos a resolver las controversias planteadas por el apelante en el recurso que nos ocupa.

-III-

Es la contención principal del apelante en el recurso de epígrafe que incidió el foro primario al declarar ha lugar la petición de modificación de alimentos entre parientes presentada por el apelado en julio de 2017, y al imponerle la obligación de pagar alimentos entre parientes a favor del apelado **a partir de agosto de 2017.** En síntesis, arguye el apelante que el joven adulto incumple con los requisitos para que procedan alimentos entre parientes según solicitados. El señor Prieto Irizarry sostiene además, que no incurrió en temeridad al defenderse de la reclamación del apelado por lo que incidió el TPI al imponerle una suma concepto de honorarios de abogado.

Surge de la prueba desfilada y así lo determinó el foro primario que en el año 2016 el apelante quedó desempleado hasta mayo de 2017. Es además, una determinación de hecho del foro primario, durante el mes de diciembre de 2016, enero, febrero, marzo de 2017 el Sr. Prieto no hizo aportación económica al apelado.[30]

Posteriormente, en mayo de 2017 las partes informaron un acuerdo de pensión entre parientes, de 4 de mayo de 2017, que fue recogido en una Resolución. A

---

[30] *Véase* Determinación de Hecho Núm. 42 de la *Resolución Enmendada.*

partir de esa fecha, el apelado comenzó a trabajar en la corporación de su cónyuge en la que devengaba un sueldo mensual de $3,000.

De igual forma surge de la prueba desfilada lo siguiente:

47. **En ese semestre de enero a mayo de 2017, mientras estuvo en Ponce, había subido sus notas.**
48. **Juan le informó a la madre que regresaría a Temple, estudiaría en artes y continuaría derecho. Aunque la madre lo confrontó porque llevaba más de dos años en ciencia, lo apoyó en su decisión.**
49. **La Universidad Católica tiene programa de Filosofía. Sin embargo, Juan tomó la decisión de continuar Artes y Filosofía en Temple toda vez que se tardaría más en la Universidad Católica.**
58. **Los gastos de Temple eran más altos que la Universidad Católica.**

Es decir que el apelado, ya adulto, luego del acuerdo de pensión entre las partes de mayo de 2017, de las dilaciones e interrupciones en sus estudios y de haber continuado estudios en la Universidad Católica, tomó la decisión de cambiar de institución universitaria nuevamente y continuar sus estudios subgraduados en Temple aun cuando la Universidad Católica tiene igualmente un programa en Artes y Filosofía.

Si bien al apelado como joven adulto le asiste el derecho a decidir continuar sus estudios en otra institución, la obligación de continuar proveyendo alimentos entre parientes de su progenitor en cuanto a esos extremos no se extiende a cubrir los costos de su **educación universitaria extendida** y el alojamiento en dicha institución en Estados Unidos, luego de

**transcurridos los cuatro años de estudios subgraduados para culminar el bachillerato.** Durante ese tiempo el apelante continuó proveyéndole al apelado alimentos entre parientes tras este cumplir la mayoría de edad, aún cuando surge de la prueba desfilada que **este no demostró aptitud para los estudios y sus calificaciones fueron deficientes.** La contención del apelado para obtener una modificación a dicha pensión de alimentos entre parientes a los fines de que el apelante cubriera sus gastos universitarios en Temple University luego de transcurridos los cuatro años de estudios subgraduados, no encuentra apoyo en nuestro ordenamiento.

La credibilidad que el foro primario le confirió al testimonio del apelado sobre estos extremos, y los incidentes de este con su salud mental no tienen el efecto de variar o alterar los requisitos de nuestro ordenamiento para que procedan los alimentos entre parientes, a los fines de que el progenitor venga obligado a cubrir gastos universitarios que no formaron parte del acuerdo entre las partes y que se extienden más allá de los cuatro años que tiene el joven adulto para culminar estudios subgraduados. **Además, es preciso destacar que en el presente caso tampoco desfiló prueba pericial que estableciera la alegada condición de salud mental del apelado a la que tanto este como el foro primario atribuyeron la falta de aprovechamiento académico y de aptitud para los estudios.**

En lo pertinente al criterio de aprovechamiento académico como parte de los factores a considerar para determinar caso a caso si un joven adulto es acreedor a alimentos entre parientes mientras cursa estudios

universitarios y adviene a la mayoridad surge de las Estipulaciones de las partes lo siguiente:

**30.** Juan se graduó de Temple University en diciembre de 2019.

**31.** Juan se graduó de Filosofía de Temple University.

**32.El promedio de Juan en Temple fue de 2.43.**

**33.** Los promedios individuales junto a la cantidad de créditos por semestre fueron:

a. Agosto a diciembre de 2017: promedio 2.75 con 16 créditos.

b. Enero a mayo 2018: promedio de 2.67 con 12 créditos.

c. Enero a mayo 2019: promedio de 3.00 con 15 créditos.

d. Verano 2019: promedio de 2.67 con 6 créditos.

e. Agosto a diciembre de 2019: promedio de 2.50 con 16 créditos).

**34. Juan tuvo un promedio de 2.074 *[sic]* en la Universidad de la Católica a: diciembre de 2016.**

**35.** Durante el semestre de enero a agosto de 2017 Juan tomó 15 créditos en la Universidad Católica.

**36.** En Dubuque los promedios individuales junto a la cantidad de créditos por semestre fueron:

a. De agosto a diciembre de 2014 Juan tuvo un promedio 3.03 con 13 créditos. Inicialmente comenzó con 16 créditos, pero terminó con 13 créditos.

b. De enero a mayo 2014: promedio de 3.14 con 14 créditos.

c. Juan tomó una clase en la Católica que fue transferida, de 3 créditos.

d. De agosto a diciembre de 2014 Juan tuvo un promedio de 2.93 con 14 créditos.

e. **De enero a mayo de 2015 Juan tuvo un promedio de .45 Comenzó con 15 créditos y terminó con 4 créditos.**

**37.** En Temple los promedios individuales de Juan junto a la cantidad de créditos por semestre fueron:
a. **De agosto a diciembre de 2015 tuvo un promedio de .73 con 14 créditos.**

b. De agosto a diciembre de 2017 un promedio de 2.75 con 16 créditos.

c. **De enero a mayo de 2018 promedio de 2.67 con 15 créditos.**

d. De enero a mayo de 2019 tiene un promedio de 3.00 con 15 créditos.

e. En verano de 2019 tuvo un promedio de 3.67 con 6 créditos.

f. **En agosto a diciembre de 2019 un promedio de 2.50 con 19 créditos.**

38. En la Universidad Católica los promedios individuales junto a la cantidad de créditos por semestre fueron:

   a. De enero a mayo de 2016 Juan tuvo un promedio de 3.50 con 7 créditos.

   b. **En el verano de 2017 Juan tomó dos clases. En una de las clases tuvo un promedio de 1.00 y en la otra un promedio de .50.**

   c. **De agosto a diciembre de 2016 tuvo un promedio de 1.41 con 17 créditos**.

   d. De enero a mayo de 2017 tomó 15 créditos.

Razona el foro primario que, aunque el apelado tuvo tropiezos en su camino este logró graduarse en el año 2019 y que "[l}a actitud de un hijo para ser merecedor de una pensión entre parientes no debe limitarse únicamente a la cantidad de créditos o a las notas tomadas en cierto momento de tiempo." Añade el TPI que tomando en consideración las circunstancias específicas del joven no puede concluir que el apelado no tuvo una aptitud para sus estudios y atribuyó la demora a sus problemas de salud mental.

**Ciertamente, los problemas de salud mental del apelado de haberse probado con prueba pericial sobre esos extremos, lo cual no ocurrió, pudieron o no incidir o contribuir en su bajo aprovechamiento académico y en la dilación extrema del apelado en culminar su bachillerato. Sin embargo, ello por sí solo no implica**

**que procediera la modificación de la pensión de alimentos entre parientes para extenderla hasta que el apelado culminara el bachillerato. Precisamente porque el joven adulto no culminó sus estudios universitarios a nivel subgraduado en cuatro años sino en seis años y medio, en diciembre del año 2019.** Mas aún, cuando la modificación de alimentos entre parientes solicitada a los fines de culminar el bachillerato luego de cuatro años, implicó además, un incremento en el costo de la nueva institución educativa y una ampliación de cuatro a seis años para culminar los estudios a nivel subgraduado, sin el apelado probar aprovechamiento académico. Tanto de las estipulaciones de las partes como de las determinaciones de hechos quedó establecido la falta de aprovechamiento académico y aptitud para los estudios del joven adulto durante dichos años.

Es doctrina reiterada que la situación particular que representan los estudios postgraduados, como maestrías o doctorados, y el estudio de aquellas profesiones **que requieren en exceso de los cuatro años de bachillerato** amerita una **consideración especial y separada** que, **como regla general, tendrá que ser resuelta de acuerdo con los hechos particulares de cada caso.** *Rivera v. Villafañe González, supra.* Véase, además, *Key Nieves v. Oyola Nieves*, *supra*. **Para ser merecedor de estos beneficios es indispensable demostrar aptitud para los estudios, a la par con el aprovechamiento académico.** *Rivera v. Villafañe González, supra.*

Con estos antecedentes, **concluimos que incidió el foro primario al declarar ha lugar la solicitud de**

**modificación de alimentos entre parientes presentada por el apelado en julio de 2017, y que impuso al señor Prieto Irizarry la pensión de alimentos entre parientes a favor del apelado desde agosto de 2017 hasta que este culminara sus estudios subgraduados en Temple University en el año 2019. Incidió además el TPI al concluir que el apelante fue temerario y al imponerle al señor Prieto Irizarry una suma de honorarios de abogado, tras este defenderse de la reclamación del apelado.**

El apelado **no cumplió con los criterios para ser acreedor a dicha pensión de alimentos entre parientes, objeto de su petición de julio de 2017,** ya que independientemente de la credibilidad atribuida a su testimonio por el foro primario, **este no demostró aptitud para los estudios, ni aprovechamiento académico.**

**En consecuencia se revocan aquellos extremos de la** *Resolución Enmendada* **en los que el foro primario ordenó al señor Prieto a pagar al apelado una pensión de alimentos entre parientes de $2,447.46 desde agosto de 2017 hasta agosto de 2019 y la suma de $1,443.46 desde septiembre de 2019 a julio de 2019, acreditándole los $300.00 mensuales que el apelado se mantuvo pagando durante esos años. El apelante tendrá además, un crédito por los $300.00 mensuales que pagó al apelado a partir de agosto de 2017.**

**Destacamos que, a pesar de haber un acuerdo entre las partes de mayo de 2017, hubo un cambio relacionado a los estudios del apelado que no formó parte del acuerdo, cuando este decidió culminar sus estudios de bachillerato en Temple University a partir de agosto de 2017, luego de cuatro años de estudios subgraduados interrumpidos. Fue a raíz de dicho cambio, que el apelado**

**decidió no culminar sus estudios subgraduados en la Universidad Católica y presentó ante el foro primario una solicitud de modificación de alimentos entre parientes en julio de 2017, prospectiva, a los fines de que el apelante cubriera dichos gastos los cuales <u>no fueron objeto del acuerdo de mayo de 2017.</u>**

De otra parte, concluimos además, que al defenderse de la reclamación del apelado presentada en julio de 2017, tras este último cambiar de opinión sobre la institución universitaria donde culminaría sus estudios subgraduados luego de cuatro años, **<u>el apelante no fue temerario</u>**. Surge claramente del expediente y de los hechos probados que fue el apelado quien prolongó el proceso y quien obligó al foro primario a escudriñar el expediente para evaluar nuevamente la solicitud de modificación de alimentos entre parientes presentada por el joven adulto en julio de 2017. Para esa fecha ya las partes habían logrado un acuerdo, aun cuando para ese momento el apelado no era acreedor a una pensión de alimentos entre parientes, toda vez que ya habían transcurrido los cuatro años para culminar sus estudios de bachillerato y además, este no había demostrado aptitud para los estudios, ni aprovechamiento académico.

**<u>El derecho a alimentos entre parientes de un joven que adviene a la mayoría de edad mientras cursa estudios universitarios a nivel subgraduado, no se extiende automáticamente mas allá de los cuatro años hasta que este decida o logre graduarse de bachillerato.</u>**

Cónsono con los anteriores pronunciamientos revocamos igualmente aquellos extremos de la *Resolución Enmendada* en los que el foro primario determinó erróneamente que el apelante fue temerario tras este

oponerse al reclamo del apelado en julio de 2017 mediante argumentos convincentes y certeros. **En consecuencia, se deja sin efecto la imposición de la suma de $12,000.000 por concepto de honorarios por temeridad al apelante.**

Finalmente, sostenemos la determinación del foro primario de imponer al apelante el pago de la pensión de alimentos entre parientes a favor del apelado por la suma de **$576.33** **desde abril a julio de 2017**, por encontrarse el apelado para esa fecha cursando estudios subgraduados dentro de los cuatros años que reconoce la doctrina vigente que tiene el joven adulto para obtener su diploma de bachillerato y además, por <u>existir un acuerdo entre las partes de 4 de mayo de 2017 sobre dicho período</u>, **antes de que el apelado presentara la solicitud de modificación de alimentos entre parientes.** Como parte de ese acuerdo **las partes establecieron que el apelado estudiaba bachillerato en la Universidad Católica**; que el apelante pagaría la totalidad de los estudios de Juan; **que pagaría el costo de los estudios de bachillerato** y **$300 mensuales por concepto de pensión entre parientes, que el padre pagaría el costo de los estudios de bachillerato no cubierto por becas** y **ayudas económicas;** y **que cualquier cambio , relacionado a los estudios del apelado las partes podrían llegar a acuerdos y en ausencia de esto acudirían al tribunal.**[31]

Si bien reconocemos que **el apelante tiene un crédito por los $300.00 mensuales que pagó anteriormente a partir de agosto de 2017,** luego de la solicitud de modificación de pensión de julio de 2017, <u>**no procede el crédito solicitado por el señor Prieto Irizarry a la**</u>

---

[31] *Véase* determinación de hecho núm. 45 de la *Resolución Enmendada*.

**deuda de $12,000 que tiene por concepto de pensión alimentaria, computada desde el año 2016.** La contención del apelante está cimentada en que el apelado pernoctaba en su residencia en Ponce mientras cursaba estudios en la Universidad Católica. Sobre estos extremos coincidimos con el foro primario en su apreciación de la prueba y en que surge de los hechos estipulados, así como del testimonio del apelante que este no pagaba ninguno de los elementos por los cuáles solicita crédito y que su residencia constituyó un hospedaje para el menor durante dicho período por el cual el apelante tampoco tenía que pagar. En ausencia de prueba tendente a demostrar lo contrario o que el apelante costeara o asumiera las sumas por las cuales solicitó crédito se sostiene la determinación del foro primario únicamente **sobre estos extremos** de la *Resolución Enmendada*.

En resumen, reiteramos que, luego de examinar detenidamente el expediente ante nuestra consideración, nos resulta forzoso concluir que en el presente caso **el apelado incumplió con los requisitos impuestos para la determinación de que procedían los alimentos entre parientes a partir de agosto de 2017.** Así, pues, **concluimos que el apelado no demostró aptitud ni aprovechamiento académico durante cuatro años, mientras** cursaba **estudios subgraduados y durante estos cuatro años este, además de tampoco culminar su bachillerato, decidió unilateralmente continuar sus estudios subgraduados en Estados Unidos con la expectativa irrazonable de que el apelante continuara sufragando sus estudios sin cumplir con los requisitos para que, en estricto derecho, su petición procediera.** Por consiguiente, concluimos que el foro primario cometió

los errores señalados por el apelante referente al incumplimiento del apelado con los requisitos para ser acreedor a una pensión de alimentos entre parientes, a partir de agosto de 2017.

-IV-

Por los fundamentos anteriormente expuestos, los cuales hacemos formar parte de esta Sentencia, **revocamos** **aquellos extremos de la *Resolución Enmendada* en los que el foro primario impuso al apelante la obligación de proveer alimentos entre parientes al apelado a partir de agosto de 2017, así como la imposición al señor Prieto Irizarry de la suma de $12,000.00 por concepto de honorarios de abogado.** Los demás extremos de la *Resolución Enmendada* se confirman de forma cónsona con los anteriores pronunciamientos.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

*Lcda. Lilia M. Oquendo Solís*
*Secretaria del Tribunal de Apelaciones*